[This opinion has been published in *Ohio Official Reports* at 83 Ohio St.3d 253.]

THE STATE OF OHIO, APPELLEE, *v.* RAGLIN, APPELLANT.

[Cite as *State v. Raglin*, 1998-Ohio-110.]

*Criminal law—Aggravated murder—Appeals in cases in which sentence of death has been imposed for an offense committed on or after January 1, 1995 shall be made directly from the trial court to the Supreme Court of Ohio— Death penalty upheld, when.*

(Nos. 96-2872 and 97-141—Submitted July 15, 1998—Decided September 30, 1998.)

APPEAL from the Common Pleas Court of Hamilton County, No. B-96000135.

APPEAL from the Court of Appeals for Hamilton County, No. C-970009.

————————————

{¶ 1} During the early morning hours of December 29, 1995, appellant, Walter Raglin, and appellant's friend, Darnell "Bubba" Lowery, were looking for someone to rob. Appellant was wearing dark clothes and a black ski mask and was armed with a .380 semiautomatic pistol he had obtained from Lowery. The two men considered robbing a "dope boy," *i.e.*, a drug dealer, but decided against it for fear that such a person could be armed. They also discussed the possibility of robbing a taxicab driver, but appellant suggested that it might be safer for the two men to rob a more vulnerable victim.

{¶ 2} Meanwhile, at approximately 1:30 a.m., Michael Bany,[1] a musician, concluded an engagement at a bar on Main Street in Cincinnati. At approximately

———————————

1. There is some confusion in the record concerning the spelling of the victim's last name. The printed transcript uses the spelling "Baney," whereas other portions of the record (including the indictment) reflect that the spelling is "Bany." We have been forced to elect between the alternate spellings for purposes of our opinion in this case. If the spelling we have chosen is incorrect, we extend our deepest apologies to anyone who may take issue with that matter. We certainly intend no disrespect for the memory of the decedent.

1:45 a.m., Bany left the bar carrying a bass guitar and a black bag or suitcase with music equipment and headed toward the parking lot where he had parked his car. Appellant and Lowery saw Bany and decided to rob him. While Bany was attempting to unlock the door to his vehicle, appellant approached him from behind, pulled out the .380 semiautomatic pistol, and demanded Bany's money. Bany handed appellant three $20 bills. Appellant then asked Bany whether Bany's car had an automatic or manual transmission since appellant planned to steal the car if it was an automatic. Bany did not reply to appellant's question. Appellant repeated the question, but Bany remained silent. At some point, Bany bent down to pick up his guitar case and/or his music equipment and turned to face appellant. While appellant and Bany were looking at each other, appellant shot Bany once in the side of the neck, killing him. The projectile entered through the left side of Bany's neck, just below the earlobe, and exited through the right side. The path of the projectile indicated that appellant and Bany were not standing face-to-face at the time of the shooting. Additionally, the record indicates that the shot was fired at the victim from a distance of more than three feet.

{¶ 3} Following the killing, appellant and Lowery ran to a house several blocks away from the scene of the murder. There, appellant cleaned the pistol of fingerprints and gave it to Lowery. Appellant told Lowery that he (appellant) had received only $20 from the victim. Later, appellant spent the $60 he had taken from Bany to purchase marijuana.

{¶ 4} On January 3, 1996, Cincinnati police received an anonymous telephone call identifying appellant as a suspect in the murder. Appellant was apprehended by police and was taken to an interview room for questioning. There, appellant voluntarily agreed to speak with police after being advised of his *Miranda* rights. See *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 5} During questioning, appellant lied to the police and denied any involvement in the murder. When police informed appellant that they had received telephone calls naming appellant as a suspect, appellant changed his story and admitted that he had been at the scene of the murder. Appellant told police that he had been paid $25 for being a lookout for Lowery, and that Lowery had robbed and killed Bany. The police officers then left the interview room. A short time later, appellant summoned an officer back to the room and admitted that he had shot Bany. Appellant then confessed to robbing and killing Bany and gave police a detailed account of the murder.

{¶ 6} After giving a full confession to police, appellant agreed to repeat his statement on tape. Appellant was once again advised of his *Miranda* rights. At that time, appellant indicated that he wanted to speak to an attorney. Therefore, police stopped the recorder, ceased their interrogation of appellant, and offered to bring appellant a telephone book and to assist him in obtaining counsel. Appellant stated that he did not want to inconvenience the officers, but police assured him that his request for counsel was not an inconvenience. Nevertheless, despite these assurances, appellant told police that he had changed his mind concerning his request for counsel and that he wished to continue with his statement. At that point, police resumed the interview and once again advised appellant of his rights. After ensuring that appellant fully understood his right to counsel and had freely and intelligently abandoned his known rights, police resumed the interrogation and tape recording of appellant's statement, and appellant reiterated the details of the robbery and killing.

{¶ 7} In January 1996, appellant was indicted by the Hamilton County Grand Jury for the aggravated murder of Bany. Count Four of the indictment charged appellant with purposely causing the death of Bany during the commission of an aggravated robbery. Count Four of the indictment also carried an R.C. 2929.04(A)(7) death penalty specification. Count Three of the indictment charged

appellant with the aggravated robbery of Bany. Counts One and Two of the indictment charged appellant with certain offenses that were unrelated to the robbery and killing of Bany. Counts Two, Three, and Four carried a firearm specification. Appellant eventually entered a plea of no contest to the charge set forth in Count One of the indictment and the specification in connection with that count. Additionally, the state of Ohio eventually dismissed Count Two.

{¶ 8} The charges and specifications relating to the aggravated robbery and aggravated murder of Bany (*i.e*., Counts Three and Four and related specifications) proceeded to trial by jury. The jury found appellant guilty of these charges and specifications. With regard to the R.C. 2929.04(A)(7) death penalty specification, the jury found that appellant was the principal offender in the commission of the aggravated murder. Following a mitigation hearing, the jury recommended that appellant be sentenced to death for the aggravated murder of Bany. The trial court accepted the jury's recommendation and imposed the sentence of death. For the aggravated robbery of Bany (Count Three), for the matter to which appellant had pled no contest (Count One), and for the firearm specification in connection with Count Three, the trial court sentenced appellant in accordance with law.

{¶ 9} In case No. 96-2872, appellant directly appeals his convictions and sentences for aggravated murder and aggravated robbery (and for the associated firearm specifications) from the trial court to this court pursuant to Section 2(B)(2)(c), Article IV of the Ohio Constitution, as amended in 1994. See, also, R.C. 2953.02. Appellant also filed a notice of appeal in the court of appeals. However, the court of appeals issued an entry striking the notice of appeal because the appellate court lacked jurisdiction to consider appellant's appeal from the imposition of the death penalty. See Sections 2(B)(2)(c) and 3(B)(2), Article IV of the Ohio Constitution, and R.C. 2953.02. In case No. 97-141, appellant appeals from the court of appeals' decision striking the notice of appeal. Upon motion, we consolidated the two cases.

———————————

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, *Steven W. Rakow* and *Ronald W. Springman*, Assistant Prosecuting Attorneys, for appellee.

*H. Fred Hoefle* and *David J. Boyd*, for appellant.

———————————

**DOUGLAS, J.**

{¶ 10} Appellant presents twenty-one propositions of law for our consideration. (See Appendix, *infra*.) We have considered each of appellant's propositions of law and have reviewed the death penalty for appropriateness and proportionality. Upon review, and for the reasons that follow, we uphold appellant's convictions and sentences, including the sentence of death.

I

{¶ 11} We have held, time and again, that this court is not required to address and discuss, in opinion form, each and every proposition of law raised by the parties in a death penalty appeal. We continue to adhere to that position today. We recognize that the case at bar is among the first of the death penalty appeals that have come to this court on direct appeal from the trial courts of this state. However, in this case, as in all other death penalty cases, we have carefully considered all of the propositions of law and allegations of error and have thoroughly reviewed the record in its entirety. Most of the issues raised by appellant have been addressed and rejected by this court under analogous circumstances in a number of our prior cases. Therefore, these issues require little, if any, discussion. Additionally, a number of appellant's arguments have been waived. Upon a careful review of the record and the governing law, we fail to detect any errors requiring reversal of appellant's convictions and sentences. We have found nothing in the record or in the arguments advanced by appellant that would, in any way, undermine our confidence in the integrity and reliability of the trial court's findings. Accordingly,

we see no reason to deviate from our prior procedures in death penalty appeals. We address and discuss, in detail, only those issues that merit analysis.

## II

## Proposition of Law No. 1

{¶ 12} The trial court, in its sentencing opinion, considered and weighed an R.C. 2929.04(A)(3) aggravating circumstance even though appellant was neither charged with nor convicted of an R.C. 2929.04(A)(3) death penalty specification. However, this error in the trial court's sentencing opinion, and all other allegations of error raised by appellant in Proposition of Law No. 1, can be readily cured by our independent review of appellant's death sentence. See, generally, *State v. Lott* (1990), 51 Ohio St.3d 160, 170-173, 555 N.E.2d 293, 304-307. See, also, *State v. Reynolds* (1998), 80 Ohio St.3d 670, 684-685, 687 N.E.2d 1358, 1373; *State v. Gumm* (1995), 73 Ohio St.3d 413, 424, 653 N.E.2d 253, 265; and *State v. Fox* (1994), 69 Ohio St.3d 183, 191-192, 631 N.E.2d 124, 131.

## III

## Proposition of Law No. 2

{¶ 13} Appellant contends that the trial court erred by refusing to instruct the jury on involuntary manslaughter as a lesser included offense of aggravated murder. We disagree. We have considered similar issues in a number of prior cases and have discussed those issues to exhaustion. The applicable rule is that "[e]ven though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. We find no evidence in this case to reasonably suggest that appellant lacked the purpose to kill his victim.

{¶ 14} The facts of this case are clear. Appellant and his accomplice, Darnell Lowery, wandered the streets of Cincinnati looking for a victim to rob. Appellant was carrying a loaded .380 caliber semiautomatic pistol. The men considered two potential classes of victims to rob, but decided to search for easier prey. While appellant and Lowery were searching for a defenseless person to rob, appellant's unfortunate victim, Michael Bany, arrived on the scene. Appellant approached Bany and demanded money. Bany complied with appellant's demands. The record clearly indicates that Bany presented no threat to appellant and that appellant and Bany never argued. Bany never spoke a single word to appellant. While appellant was asking questions concerning Bany's car, Bany bent down and picked up what appellant referred to as a "suitcase," *i.e.*, either the guitar case or the case containing Bany's music equipment. Bany turned to look at appellant, and appellant looked at Bany. Appellant then pointed the pistol at Bany and shot him in the neck in a manner that was certain to (and did) cause Bany's death.

{¶ 15} Appellant told police, "I, I fired the gun at [Bany]. I didn't know where I hit [him] at. I wasn'[t] tryin' to kill [him]." Appellant also claimed to have "panicked" at the time he shot and killed Bany. Appellant told police that he had been "scared" by Bany's movements because appellant "didn'[t] know what * * * was in the suitcase." However, appellant never claimed that the shot had been accidentally or unintentionally fired, and the evidence clearly establishes that the shooting was not accidental or unintentional. Appellant's claims of panic and fright are not reasonably supported by the evidence. Appellant had a loaded weapon, he was pointing that weapon at Bany, and he fired that weapon into the neck of his defenseless victim. Appellant told police that he had fired the weapon directly at Bany. He told police that Bany was not trying to "fiddle" with the suitcase or anything of that nature and that Bany had simply "picked it up." Appellant also admitted to police, "I didn'[t] have to shoot that man." The direct and circumstantial evidence in this case, and all reasonable inferences to be drawn

therefrom, lead to one inescapable conclusion, to wit, appellant purposely killed Bany during the commission of an aggravated robbery when he pointed the gun at Bany and pulled the trigger.

**{¶ 16}** Under any reasonable view of the evidence, the killing of Bany was purposeful. Thus, we find that the evidence adduced at trial could not have reasonably supported both an acquittal on aggravated murder and a conviction on the charge of involuntary manslaughter. Accordingly, we hold that the trial court properly rejected appellant's request for an involuntary manslaughter instruction.

IV

Proposition of Law No. 3

**{¶ 17}** Appellant argues that the evidence at trial was legally insufficient to sustain his conviction for aggravated murder. Specifically, appellant claims that the evidence was insufficient to show that he *purposely* caused the death of the victim. We disagree. The evidence in this case sufficiently, undoubtedly, and overwhelmingly supported the finding that appellant purposely killed his victim.

V

Proposition of Law No. 4

**{¶ 18}** Similarly, appellant also argues that his conviction for aggravated murder is against the manifest weight of the evidence, since, according to appellant, he did not *purposely* kill his victim. Again, we have reviewed the evidence in its entirety. Appellant's conviction for aggravated murder is not against the manifest weight of the evidence.

## VI

### Proposition of Law No. 5

{¶ 19} Appellant raises claims of prosecutorial misconduct, but many of appellant's arguments have been waived. Additionally, many of appellant's claims of prosecutorial misconduct are simply not supported by a fair and impartial review of the record, such as appellant's various attempts to persuade us that the arguments by the prosecution essentially converted the nature and circumstances of the offense into "a grossly prejudicial nonstatutory aggravating factor." We have carefully reviewed the record in its entirety and have considered all of appellant's claims of prosecutorial misconduct. We have found no instance of prosecutorial misconduct that would rise to the level of reversible error. The instances of alleged misconduct, taken singly or together, did not substantially prejudice appellant or deny him a fair trial.

## VII

### Proposition of Law No. 6

{¶ 20} The matter raised in appellant's Proposition of Law No. 6 is rejected on authority of *State v. DePew* (1988), 38 Ohio St.3d 275, 282-283, 528 N.E.2d 542, 552.

## VIII

### Proposition of Law No. 7

{¶ 21} R.C. 2929.03 was amended as part of Am.Sub.S.B. No. 2 (146 Ohio Laws, Part IV, 7136, 7454-7456) and Am.Sub.S.B. No. 269 (146 Ohio Laws, Part VI, 10752, 10926-10927) to allow a jury in a capital case to consider the sentencing alternative of life imprisonment without parole. The effective date of the amendment was July 1, 1996. Appellant committed the aggravated murder offense prior to the effective date of the amendment, but he was not sentenced until after July 1, 1996. Nevertheless, appellant contends that the trial court was required to instruct the jury, in the penalty phase, to consider the new sentencing alternative of

life imprisonment without parole. However, the sentencing provisions of Am.Sub.S.B. No. 2 apply only to those crimes committed on or after July 1, 1996. See *State v. Rush* (1998), 83 Ohio St.3d 53, 697 N.E.2d 634. Therefore, contrary to appellant's arguments, the trial court did not err by refusing to instruct the jury to consider the sentencing alternative of life imprisonment without parole.

## IX

### Proposition of Law No. 8

{¶ 22} The matter raised in appellant's Proposition of Law No. 8 has been addressed and rejected under analogous circumstances in a number of our prior cases. See, *e.g.*, *State v. Phillips* (1995), 74 Ohio St.3d 72, 101, 656 N.E.2d 643, 669, and *State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75, 80-81. We have not altered our position on the issue.

## X

### Proposition of Law No. 9

{¶ 23} In Proposition of Law No. 9, appellant questions the trial court's penalty phase jury instructions. We have reviewed the jury instructions as a whole and find appellant's objections not persuasive.

## XI

### Proposition of Law No. 10

{¶ 24} The matter raised in appellant's Proposition of Law No. 10 is rejected on authority of *State v. Greer* (1988), 39 Ohio St.3d 236, 244-246, 530 N.E.2d 382, 394-396; *State v. Carter* (1995), 72 Ohio St.3d 545, 555-556, 651 N.E.2d 965, 975; and *State v. Garner* (1995), 74 Ohio St.3d 49, 63-64, 656 N.E.2d 623, 637.

XII

Proposition of Law No. 11

**{¶ 25}** During the penalty phase, after the defense had rested, the trial court, over defense objections, permitted the state to present the testimony of two corrections officers as rebuttal witnesses. Officer Timothy Higgs testified that appellant, while in jail, had become belligerent on one occasion and had threatened to kill Higgs. Officer Byron Brown testified that appellant, while incarcerated, had attempted to escape from the fifth floor of the Hamilton County Justice Center by jumping out of a window that had been temporarily removed by workers. The prosecution asserted that this evidence was intended to rebut defense evidence that appellant (1) felt remorse for his crimes, and (2) would adjust to incarceration and could benefit others in prison.

**{¶ 26}** Appellant contends that he was unfairly prejudiced by the state's presentation of the rebuttal witnesses and that testimony of the corrections officers "injected evidence of a nonstatutory aggravating circumstance, future dangerousness," into the penalty phase. We disagree. The prosecution was entitled to introduce relevant evidence rebutting the existence of any statutorily defined or other mitigating factor first asserted by the defense. *Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus. Here, that is precisely what occurred. The testimony of the state's rebuttal witnesses was indeed relevant to rebut mitigating evidence that had been offered by the defense that appellant was remorseful for the killing, that he would help or benefit others while serving a term of life imprisonment, and that his life should therefore be spared. The testimony of the state's rebuttal witnesses was not unfairly prejudicial to appellant, was not offered for an improper purpose, and did not inject a "nonstatutory aggravating factor" into the mix.

XIII

Proposition of Law No. 12

{¶ 27} We have held, time and again, that Ohio's death penalty statutes are constitutional. To appellant's credit, he acknowledges that the arguments advanced under subsections (A) through (G) of Proposition of Law No. 12 have been raised here for the sole purpose of preserving those issues for federal appeal. The argument advanced in subsection (H) of Proposition of Law No. 12 is that this court's decision in *Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253, coupled with our decision in *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, renders Ohio's death penalty scheme unconstitutional. According to appellant, those decisions, taken together, encourage the arbitrary and capricious imposition of the death penalty. However, our decisions in those two cases do no such thing. The arguments advanced under subsection (I) of Proposition of Law No. 12 are resolved by *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.

XIV

Proposition of Law No. 13

{¶ 28} Appellant contends that he should have been allowed to challenge his convictions for aggravated murder and aggravated robbery in the court of appeals. However, as we held in *Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668, paragraphs one and two of the syllabus:

"1. The amendments to Section 2(B)(2)(c) and Section 3(B)(2), Article IV, Ohio Constitution, and the implementing statute, R.C. 2953.02, are constitutional.

"2. The courts of appeals shall not accept jurisdiction of any case in which the sentence of death has been imposed for an offense committed on or after January 1, 1995. Appeals in such cases shall be made directly from the trial court to the Supreme Court of Ohio."

{¶ 29} Thus, the court of appeals was correct to have issued the entry striking the notice of appeal that appellant had filed with that court. Accordingly, we affirm the judgment of the court of appeals in case No. 97-141.

XV

Proposition of Law No. 14

{¶ 30} In Proposition of Law No. 14, appellant contends that his confession was involuntary and that his right to counsel and right against self-incrimination were violated because, according to appellant, police should have informed him before questioning that "the statement he was about to give could be (and would be) used against him in an effort to exterminate him in the electric chair." This court has addressed and rejected similar contentions in a number of our prior cases. See, generally, *State v. Bell* (1976), 48 Ohio St.2d 270, 278, 2 O.O.3d 427, 431, 358 N.E.2d 556, 562, reversed on other grounds (1978), 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010; and *Garner*, 74 Ohio St.3d 49, 60-61, 656 N.E.2d 623, 635. Today, we likewise reject appellant's contentions that his confession was involuntary simply because he was not informed by police of the gravity of the possible punishment for the aggravated (felony) murder of Bany.

{¶ 31} The second (and far more significant) issue raised by appellant is whether he effectuated a valid—*i.e*., voluntary, knowing, and intelligent—waiver of his rights under the Fifth and Fourteenth Amendments to have counsel present during custodial interrogation. Specifically, appellant contends that the audiotaped confession should have been suppressed and held inadmissible under the rule of *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. We disagree.

{¶ 32} *Edwards* holds that once an accused undergoing custodial interrogation invokes his right to have counsel present during questioning, all further interrogation must cease, and the accused "is not subject to further interrogation by the authorities until counsel has been made available to him, *unless*

*the accused himself initiates further communication, exchanges, or conversations with the police*." (Emphasis added.) *Id*. at 484-485, 101 S.Ct. at 1885, 68 L.Ed.2d at 386. We find no violation of *Edwards* here.

{¶ 33} Appellant was advised of his *Miranda* rights before any questioning by police. He voluntarily agreed to speak with police and signed a written waiver of his *Miranda* rights. He then gave a full confession to police, but that confession was not recorded on tape. When asked to repeat his statement on tape, appellant agreed and was once again advised of his *Miranda* rights. However, at that point, appellant informed police that he wished to speak to an attorney before proceeding further. Therefore, police ceased questioning appellant and turned the recorder off. The record indicates that police offered to get appellant a telephone book and to assist him in obtaining counsel. Appellant told police that he did not want to "put [the police officers] to any trouble," but the officers assured him that his request for counsel was no trouble. Appellant then told police that he had changed his mind concerning counsel and that he wanted to "put it [his confession] on tape," and "get it off his chest." There is no evidence whatsoever that police said or did anything to change appellant's mind, and appellant changed his mind after only two or three minutes. Police then turned the recorder on and proceeded to ask appellant a series of questions regarding his waiver of the right to counsel. In response to these questions, appellant indicated that he fully understood his rights, that no threats or promises had been made to induce or coerce him into confessing, and that he wanted to put his confession on tape without talking to an attorney or having one present during questioning. The record in this case clearly reveals that it was appellant himself who, after invoking the right to counsel, initiated further conversations or communications with police concerning his wish to confess, and that appellant fully understood his right to counsel and voluntarily, knowingly, and intelligently abandoned that right before the custodial interrogation resumed.

**{¶ 34}** The trial court, in denying appellant's pretrial motion to suppress, implicitly determined that appellant's confessions to police were voluntarily given and that appellant had effectuated a voluntary, knowing, and intelligent waiver of his *Miranda* rights before his initial (unrecorded) confession to police, and again when he voluntarily confessed on tape after rescinding a request for counsel. The record before us supports the trial court's conclusions in this regard, and we find no error in that court's decision denying the motion to suppress. Accordingly, we reject appellant's fourteenth proposition of law.[2]

## XVI

### Proposition of Law No. 15

**{¶ 35}** The matter concerning the appropriateness of appellant's death sentence is addressed in our discussion in Part XXIII, *infra*.

## XVII

### Proposition of Law No. 16

**{¶ 36}** Appellant argues in Proposition of Law No. 16 that the prosecutor improperly referred to facts not in evidence during closing argument in the guilt phase. However, as appellant acknowledges, defense objections to these alleged incidents of prosecutorial misconduct were sustained. The prosecution was admonished by the court, and the jury was instructed to disregard the prosecutor's remarks. The jury is presumed to have followed the court's instructions. *State v. Goff* (1998), 82 Ohio St.3d 123, 135, 694 N.E.2d 916, 926. Appellant's argument is rejected.

---

2. We also note, in passing, that appellant apparently claims that he had a *Sixth Amendment* right to counsel during the January 3, 1996 custodial interrogation. However, we find that the Sixth Amendment was not applicable in this instance. The right to counsel that appellant invoked (but later chose to rescind) derives from the Fifth and Fourteenth Amendments to the United States Constitution as those amendments were interpreted in *Miranda*. See *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. See, also, *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378.

XVIII

Proposition of Law No. 17

{¶ 37} Appellant contends that the trial court's instructions to the jury in the guilt phase that defined "causation" in terms of foreseeability permitted a conviction for aggravated murder without proof of purpose to kill. Appellant makes a similar argument with respect to the trial court's instruction to the jury that "[i]f a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon." Appellant's arguments are not persuasive. The trial court's instructions to the jury, viewed as a whole, made it clear that a finding of purpose (and specific intent) to kill was necessary in order to convict appellant on the charge of aggravated murder. The jury in this case returned its verdicts in accordance with the overwhelming evidence on the issue. Accordingly, we find no reversible error here.

XIX

Proposition of Law No. 18

{¶ 38} We have no reason to question the trial court's decision to excuse prospective juror Solomon for cause. Her removal was warranted, since she clearly and unequivocally stated to the court that she would be unable to perform her duties as a juror. See, generally, *State v. Moore* (1998), 81 Ohio St.3d 22, 27, 689 N.E.2d 1, 8; *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, vacated and remanded on different grounds (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452.

XX

Proposition of Law No. 19

{¶ 39} Appellant contends that the prosecutor exercised two peremptory challenges in a racially discriminatory manner. Appellant relies on *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, wherein the United

States Supreme Court recognized that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of its peremptory challenges so as to exclude members of minority groups from service on petit juries. *Id*. at 89, 106 S.Ct. at 1719, 90 L.Ed.2d at 82-83. See, also, *State v. Hernandez* (1992), 63 Ohio St.3d 577, 581, 589 N.E.2d 1310, 1313. To make a prima facie case of purposeful discrimination, the defendant must demonstrate (1) that members of a cognizable racial group were peremptorily challenged, and (2) that the facts and any other relevant circumstances raise an inference that the prosecutor used the preemptory challenges to exclude jurors on account of their race. *State v. Hill* (1995), 73 Ohio St.3d 433, 444-445, 653 N.E.2d 271, 282. If the defendant makes a prima facie case of discrimination, the state must then come forward with a race-neutral explanation. *Id*. at 445, 653 N.E.2d at 282. A trial court's finding of no discriminatory intent will not be reversed on appeal absent a determination that it was clearly erroneous. *Id*. See, also, *Hernandez* at 583, 589 N.E.2d at 1314.

{¶ 40} Here, the prosecution exercised one of its peremptory challenges against prospective juror Denson, an African-American woman. The defense raised a *Batson* claim to the prosecution's use of the peremptory challenge. While it is not clear that the defense had met its burden of demonstrating a prima facie case of discrimination, the trial court nevertheless asked the prosecutor to explain or justify the peremptory challenge against Denson. The prosecutor responded: "Judge, her brother-in-law was prosecuted by our office for murder and was convicted. We feel a little uncomfortable with that." The trial court accepted this explanation. The prosecutor later stated on the record that he was not challenging prospective juror Stutson, another African-American woman, in order to purposely leave her on the jury panel. Stutson was, in fact, seated as a juror in this case.

{¶ 41} After the jury was seated, the prosecution exercised a peremptory challenge against prospective alternate juror Slade, another African-American

woman. The defense raised another *Batson* objection, and the trial judge asked the state to justify its challenge. The prosecutor stated that during the preliminary questioning of the entire venire, Slade had raised her hand to indicate that she would have a problem dealing with gruesome testimony and photographs, and that she might have a problem with the death penalty. The prosecutor explained: "Later on in the questioning [during individual voir dire] she changed that and was able to pass for cause. But for those reasons we feel that she's indicated at least at one point some problem sitting on this case." The trial court accepted this explanation. Additionally, as it eventually turned out, the alternates were never required to serve on the jury panel.

{¶ 42} As to both *Batson* objections, the trial court required the state to respond and accepted the prosecution's race-neutral explanations for the use of the peremptory challenges. With respect to each *Batson* objection, we question whether appellant ever demonstrated a prima facie case of purposeful discrimination that would have necessitated a response by the prosecution. In any event, the explanations provided by the prosecution were specific and race-neutral, and the trial court's acceptance of the justifications was not erroneous. Considering the relevant circumstances surrounding the *Batson* issues, the trial court's apparent finding of no discriminatory intent was not clearly erroneous. Indeed, it appears to us that the trial court's actions in permitting the use of the peremptory challenges was reasonable and proper. Thus, appellant's claims that the trial court erred in permitting the use of the peremptory challenges are not well taken.

XXI

Proposition of Law No. 20

**{¶ 43}** We reject appellant's Proposition of Law No. 20 on authority *of State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

XXII

Proposition of Law No. 21

**{¶ 44}** Appellant argues that the cumulative effect of errors at the trial court level deprived him of a fair trial and a fair and reliable sentencing determination. We reject appellant's argument in this regard. We find that appellant received a fair trial and a fair and reliable sentencing determination.

XXIII

**{¶ 45}** Having considered appellant's propositions of law, we must now independently review the death sentence for appropriateness (also raised in appellant's Proposition of Law No. 15) and proportionality. We find that the aggravating circumstance appellant was found guilty of committing (R.C. 2929.04[A][7]) was proven beyond a reasonable doubt.

**{¶ 46}** In mitigation, appellant's two sisters, Tabatha and LaSonya Raglin, and his father, Walter Raglin, Sr., testified concerning the difficult circumstances of appellant's youth.

**{¶ 47}** Testimony established that appellant was born into a stable home environment. However, when appellant was approximately two or three years old, his parents began living apart. Following the separation, appellant and his two older sisters, Tabatha and LaSonya Raglin, lived with their mother during a series of peripatetic moves and travels. Apparently, things remained relatively stable for a brief period of time following the separation, but the mother then began carousing with male acquaintances and using crack cocaine. The mother eventually became heavily involved in a life of drug and alcohol abuse, and appellant's father became

involved in a life of crime. On one occasion, the children witnessed an incident where their mother shot and wounded their father during a domestic dispute. During appellant's childhood, his father was incarcerated on several occasions for drug-related offenses. The father was also incarcerated at the time of appellant's trial and testified in the penalty phase (on videotape) from a Kentucky prison where he was serving a twenty-year sentence for possession of cocaine.

{¶ 48} Testimony established that during appellant's childhood appellant and his siblings moved with their mother from place to place. The mother had numerous boyfriends and gave birth to two additional children (appellant's younger half-brothers) from liaisons with different men. The housing in which the mother and children lived was deplorable. The homes were characterized by extreme filth and inadequate facilities. Some of the places were infested with mice and insects. When the mother began dating workers at racetracks in Kentucky, she lived with appellant and some of appellant's siblings in tack rooms near the horse stables. The tack rooms were very small and there was no kitchen, electricity, plumbing, or privacy. LaSonya recalled finding the mother in the bathroom at one residence "shooting up" drugs intravenously, causing blood to spatter all over the room, including the ceiling. LaSonya also recalled having attempted to clean the bathroom so that her younger brothers would not be exposed to what their mother had done. Additionally, the mother would often abandon the children for days or a week at a time and spent some nights in jail for prostitution. While the mother was out "[r]unning the streets and getting high," Tabatha and LaSonya were attempting to raise the younger children, none of whom regularly attended school. When appellant was approximately nine years old, the mother allowed him to drink alcohol and smoke cigarettes, and appellant began stealing money at his mother's command. The mother would use the money to support her drug habit. On one occasion, someone fired shots at the family home after appellant, at his mother's direction, stole $700 or $800 from a drug dealer that LaSonya had been dating. The

mother also engaged in prostitution and used her monthly ADC checks to purchase drugs. Apparently, during his preteen years, appellant would accompany the mother to drug deals as a form of protection for his mother.

{¶ 49} Tabatha, at the age of twenty or twenty-one, obtained custody of appellant, who, at the time, was either twelve or thirteen years old. Tabatha also obtained custody of the two younger boys. However, Tabatha testified, "I was just a sister. He [appellant] was already taller than I was. He never disrespected me, but he just did what he wanted to do." Tabatha also testified, "Whatever I told Walter to do she [the mother] would tell the opposite." Tabatha testified further: "He [appellant] never had nobody to show him the right way. Nobody. My mother always showed him the wrong way." LaSonya and Tabatha also recounted several instances where appellant, as a child, had engaged in self-destructive behavior, including jumping out of windows, putting firecrackers in his shoes, and shooting himself in the leg. On one occasion, when appellant was eleven or twelve years old, he was drunk and put his hand through a glass window. Appellant also spent time in several juvenile facilities in Kentucky and, on one occasion, underwent psychiatric evaluation.

{¶ 50} After Tabatha had obtained custody of the children, appellant got in trouble for not attending school and was once again placed in a juvenile facility in Lexington, Kentucky. There, appellant's mother visited appellant and, without permission and unbeknownst to either Tabatha or the authorities, took appellant out of the facility and out of the state. When Tabatha and the authorities discovered that appellant was missing, they assumed that appellant had simply walked away from the facility. The mother then brought appellant to Cincinnati, Ohio, and Tabatha and the authorities did not know of appellant's whereabouts. While in Cincinnati, appellant, who was approximately thirteen or fourteen years old at the time, lived with the mother and her boyfriend. The boyfriend, who was also the mother's former pimp, sometimes would not permit appellant to live in the house.

Thus, appellant would occasionally be forced to live and sleep in a junkyard owned by the boyfriend. It was not until a year later that Tabatha found out where appellant was living.

{¶ 51} Appellant also presented the testimony of John Hale, a Kentucky law enforcement officer and a former social worker. Hale first met appellant when appellant was approximately twelve or thirteen years old. At that time, Hale was a social worker in Kentucky and had received a referral concerning appellant from appellant's school or from a state social worker. Hale testified that when he conducted the first home visit at Tabatha's residence, several people were seated around a table smoking marijuana. According to Hale, Tabatha's having custody of appellant was like "a child raising a child." Hale also testified that he was able to form a bond with appellant during appellant's childhood. However, according to Hale, the "lure of the streets" and appellant's "street savvy" caused him to opt for the streets rather than to accept the services that Hale could provide. Nevertheless, Hale testified that "Walter probably has more potential and value tha[n] anybody I ever seen." Hale testified further: "He just never was challenged and never believed that he was worth something because one of the greatest needs that we have in life is [the] need to be loved. And I don't think he got the proper love or somebody really to love him for who he is. Not for how tall he was or how smart he was or how street savvy he was. He got fed the wrong information and his behavior just escalated and channeled in the wrong direction." Hale had also promised appellant, during his childhood, that he (Hale) would always be available to appellant whenever he needed help. However, appellant apparently never took full advantage of that offer until after he robbed and killed Bany.

{¶ 52} During the mitigation phase, appellant gave an unsworn statement in which he expressed sorrow for the pain and grief he had caused to Bany's family, to society, and to his own family. Additionally, he stated, "[K]nowing that I took a person's life * * * haunts me every second and every minute of my life. It's going

to be with me forever." Appellant also stated, "I don't think I deserve the death penalty. I think I deserve a life sentence." Appellant then repeated that he was sorry for what he had done and for putting everyone "in this situation like this, especially the [Bany] family."

{¶ 53} Dr. Kathleen J. Burch, appellant's court-appointed psychologist, testified in mitigation. Burch, a clinical psychologist, first met with appellant in March 1996. Between that time and the time of the mitigation hearing, Burch met with appellant on a number of occasions, performed psychological testing, interviewed Tabatha and LaSonya Raglin, and reviewed records and other information concerning appellant. Burch noted that appellant had grown up in an "extremely impoverished, extremely frightening, unsupportive and chaotic environment." She also noted that "some of the conditions under which he lived as a young child are sort of like the things you read about going on in Rio [de Janeiro] or Calcutta, so it's pretty extreme circumstances." Burch described appellant as having a very problematic and very insecure relationship with his mother. Burch stated that the major bonding between appellant and the mother during his childhood years centered around alcohol and drug use. Burch also stated that, according to appellant and his sisters, the mother had begun furnishing him with alcohol when he was just nine years old. Burch testified that "according to [appellant] he and his mother would be together [and] she would do her drugs and he would do his." Burch also testified that the relationship between appellant and the mother was obviously very conflicted and unhealthy and that he lacked appropriate parental support, guidance, and nurturing during his formative years.

{¶ 54} Dr. Burch performed psychological and neuropsychological testing of appellant. Burch testified that she was able to obtain valid test data despite the fact that, among other things, appellant had initially lied to her to make himself appear less responsible. Burch testified that the results of the psychological testing were consistent with the profile of a person who lacks a well-developed sense of

self, who is prone to "problems with impulse control and his thinking that are greatly in excess of those that other people experience," and who has "real difficulties with his mood." Burch also testified that appellant has an overall IQ of eighty-one which, according to Burch, "is at the low end of the low average range and compared to others his age this means that 90 percent of people his age would earn better scores than he would on this test." Burch testified further that the neuropsychological testing yielded results that were consistent with a finding of "some mild deficits in the integrity and functioning" of appellant's brain. Burch stated that this mild brain damage may have been caused by a series of closed-head injuries, such as the "repeated insults to [appellant's] brain over a number of years from automobile accidents which he described to me, from fits, from falls and also very heavy alcohol use."

{¶ 55} Burch diagnosed appellant as suffering from adjustment disorder with depressed mood, cognitive disorder, alcohol-related disorder, cannabis-related disorder, borderline personality disorder, and antisocial personality disorder. Burch was asked the following questions, and gave the following responses, concerning the existence of the R.C. 2929.04(B)(3) mitigating factor:

"Q. Does Walter have a mental disease or defect?

"A. Yes, he does.

" * * *

"Q. Which do we have?

"A. Well, he actually is at least moderately impaired at this time both by the adjustment disorder diagnosis and the cognitive disorder as well as the personality disorder diagnoses. He is a person who has very significant, ongoing difficulty with managing himself and dealing with the environment.

"Q. At the time of the offense for which Walter has been convicted, did the symptoms of his mental defect substantially impair his capacity to appreciate the criminality of his conduct?

24

"A.    I don't believe so.

"Q.    Is that opinion offered within a reasonable degree of psychological certainty?

"A.    Yes.

" * * *

"Q.    Okay.  Mitigating factors [*i.e.*, the R.C. 2929.04(B)(3) mitigating factor] talking about lacking substantial capacity to appreciate the criminality or to conform [*sic*]?

"A.    Or to conform.  I think that's the critical issue with Walter.  Because I do believe that with his marked impairments of impulse control that are substantiated in his history and in the psychological testing results and neuro-psychological test results he has much more difficulty than your average person in withstanding impulses, in controlling impulses and controlling his behaviors.

"Q.    So * * * would [it] be your opinion that his mental disease or defect impairs his capacity to conform his conduct to the requirement of the law?

"A.    Yes.

" * * *

"Q.    With all the clarification then, Doctor, maybe we can better appreciate the composite picture, the overall of your diagnostic impression.  If you could just briefly highlight the most important features of your diagnosis.

"A.    Okay.  I believe that Walter has some acute psycho-pathology meaning the adjustment disorder.  He has this underlying depression and this vulnerability to depression * * *.  He also has from the neuro-psychological evaluation evidence of some real impairment of his brain from repeated injuries and the repeated assaults of the substance abuse which impair his ability to thoughtfully and reasonably and adaptively plan and organize and conduct his behavior.

"He also has the substance abuse diagnoses. They're not operative right now except for the residual effects, and then he also qualifies for two personality diagnoses, personality disorder diagnoses borderline and anti-social. Is that what you wanted?

"Q. Yeah. And then again as a result of that diagnosis you feel that he lacked substantial capacity to conform his conduct?

"A. Yes, I do."

{¶ 56} Burch also testified about a variety of other matters concerning appellant's history, background, and psychological composition. Additionally, Burch testified that appellant had stated to her that he never intended to kill the victim. Burch testified further that appellant had expressed regret over the killing.

{¶ 57} On cross-examination, the prosecutor questioned the validity and legitimacy of the psychological and neuropsychological test results and questioned Burch's various conclusions regarding appellant's psychological conditions. Additionally, the prosecutor pointed out to Burch that appellant had spoken to friends immediately after the killing and had laughed and bragged about the murder. Burch explained that appellant's behavior in bragging about the murder was not surprising and was consistent with appellant's background and psychological makeup. In response to further questioning, Burch indicated that appellant had admitted to her that the shooting was intentional. With respect to the R.C. 2929.04(B)(3) mitigating factor, the prosecutor questioned Burch as follows:

"Q. You're saying he did know what he did was wrong?

"A. Correct.

"Q. Are you saying that he could not prevent himself from doing that though?

"A. No. What I said was that I believe that compared to the average person his ability to conform his behavior to the requirements of the law in that case was substantially impaired.

"Q.    And that's because of this Anti-Social Personality Disorder that says he has a disregard for the rights of other people?

"A.    No.  I believe that that's due to the other personality disorder aspects of impaired impulse control in combination with the evidence of neuro-psychological deficit impacting the frontal lobe functions.  And also you would have to say if indeed he was strongly intoxicated at the time, the impact of that, of the substances.

"Q.    You were assuming that he was strongly intoxicated?

"A.    That's what I was told.  That's [what] I was told.  It would not be inconsistent with his history.

"Q.    The plan that he carried out that night, and again from his statement I believe you can see that he wore a mask, he had a weapon, that he wiped his prints off immediately afterwards —

"A.    Yes.

"Q.    —he waited, he apparently bypassed a couple of targets:  a cabdriver and a drug boy?

"A.    Um-hum.

"Q.    Is that consistent with someone that's acting on impulse?

"A.    Well, not that aspect of it."

{¶ 58} Following the presentation of the defense witnesses, the state presented the testimony of two witnesses in rebuttal.  See our discussion in Part XII, *supra*.

{¶ 59} Upon a review of the evidence in mitigation, it is clear to us that appellant had an extremely difficult and troubled childhood.  He lacked appropriate parental support and guidance, his family life was chaotic, the conduct of his mother was reprehensible, and the resulting situations appellant was subjected to during his formative years are nothing short of atrocious.  We find that appellant's troubled

childhood, history, and family background are entitled to some meaningful weight in mitigation.

{¶ 60} The nature and circumstances of the offense reveal nothing of any mitigating value. The R.C. 2929.04(B)(1), (2), (5), and (6) mitigating factors are not applicable on the record before us.

{¶ 61} Appellant was eighteen years old at the time of the offense. We find that this R.C. 2929.04(B)(4) mitigating factor (youth of the offender) is entitled to some weight in mitigation.

{¶ 62} The mitigating factor set forth in R.C. 2929.04(B)(3) is "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Here, there is no question that appellant did appreciate the criminality of his conduct. However, Dr. Burch clearly testified in mitigation that, in her opinion, appellant suffers from a mental disease or defect. She also clearly testified that, because of appellant's psychological and neuropsychological conditions and lack of impulse control, appellant lacked substantial capacity to conform his conduct to the requirements of the law. Nevertheless, we have serious reservations whether appellant established the R.C. 2929.04(B)(3) mitigating factor by a preponderance of the evidence. First, we note that there is no medical evidence of appellant's impaired brain function, although we acknowledge that medical testing might be incapable of confirming the type of mild brain deficit that Burch's testing revealed. Second, Burch apparently relied on appellant's statements that he had suffered from repeated head injuries. However, on cross-examination, the prosecutor pointed out that during a medical evaluation on December 29, 1994, *i.e.*, one year before the killing, appellant denied that he had ever suffered a head injury. Third, it appears from Burch's testimony on cross-examination that she had assumed for purposes of her opinion that appellant was "strongly" intoxicated at the time of the shooting. While

there is some evidence of the fact that appellant may have consumed alcohol and smoked marijuana prior to the murder, we find no credible evidence that appellant was intoxicated. Fourth, and perhaps most important, we find no credible evidence that reasonably suggests that appellant acted impulsively and, thus, was substantially unable to control his behavior at the time of the murder. In our judgment, the nature and circumstances of the offense clearly indicate a lack of impulsive behavior in the planning and execution of the robbery, in the killing that occurred during the robbery, or in appellant's actions immediately following the robbery and killing. In any event, assuming that the R.C. 2929.04(B)(3) mitigating factor was established in this case, we assign this factor, and the testimony concerning appellant's various psychological conditions, limited weight in mitigation.

{¶ 63} We have also considered appellant's cooperation with police and his expressions of remorse and sorrow. We assign these matters some, but very little, weight in mitigation. (R.C. 2929.04[B][7].)

{¶ 64} During the course of the robbery, Bany fully complied with the demands appellant made of him, offered no resistance, and presented no threat. However, appellant did not simply walk away from the robbery after having taken Bany's money. He also took Bany's life. In his confession to police, appellant said, "I didn'[t] have to shoot that man." There is no question about it—appellant did *not* need to shoot and kill Bany. Nevertheless, appellant did purposely kill Bany during the course of the aggravated robbery, and the killing was senseless, tragic, and wholly avoidable. The combined mitigating factors in this case (including appellant's pathetic family background) are stronger than the mitigation we typically see in some appeals involving the death penalty. However, the mitigating factors in this case are heavily counterbalanced by the R.C. 2929.04(A)(7) specification of the aggravating circumstance appellant was found guilty of committing.

**{¶ 65}** Weighing the evidence presented in mitigation against the single R.C. 2929.04(A)(7) aggravating circumstance, we find that the aggravating circumstance outweighs the mitigating factors. We find this beyond a reasonable doubt.

**{¶ 66}** As a final matter, we have undertaken a comparison of the sentence imposed in this case to those in which we have previously imposed the death penalty. Appellant's death sentence is neither excessive nor disproportionate in comparison to the penalty imposed in similar cases. See, *e.g.*, *State v. Spivey* (1998), 81 Ohio St.3d 405, 692 N.E.2d 151.

**{¶ 67}** Accordingly, for the foregoing reasons, we affirm appellant's convictions and sentences, including the sentence of death, in case No. 96-2872. We affirm the judgment of the court of appeals in case No. 97-141.

*Judgments affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

———————————

APPENDIX

**{¶ 68}** "*Proposition of Law No. 1:* Where, in a capital case, the sentencing court considers and weighs invalid or improper aggravating circumstances; fails to consider and weigh valid mitigating factors presented by the defense; and fails to specify the reasons why aggravation outweighs mitigation beyond a reasonable doubt, the death sentence offends the Eighth Amendment to the Constitution of the United States, and the right to due process under the Fourteenth Amendment, and their counterparts in the Ohio Constitution, and must be reversed.

**{¶ 69}** "*Proposition of Law No. 2:* Involuntary manslaughter is always a lesser included offense of aggravated murder, and where the accused has denied a purposeful killing, he is entitled by due process to an instruction on the lesser offense, and denial of a proper request for an instruction on the lesser offense

violates the Due Process Clause of the U.S. and Ohio Constitutions, rendering the conviction of capital murder unconstitutional, and the death sentence void.

{¶ 70} "*Proposition of Law No. 3:* Where the state fails to prove beyond a reasonable doubt the essential element of purpose to kill, convictions for aggravated murder must be reversed as contrary to the right of the accused to due process of law under the Ohio and federal Constitutions.

{¶ 71} "*Proposition of Law No. 4:* Convictions for aggravated murder which are contrary to the manifest weight of the evidence must be reversed, as contrary to the right of the accused to due process of law under the Ohio and federal Constitutions.

{¶ 72} "*Proposition of Law No. 5:* Egregious misconduct by the prosecutor in the penalty phase of capital proceedings requires reversal, and where the prosecutor's final argument for death argues nonstatutory aggravating factors, argues 'facts' outside the evidence, attacks the relevance of evidence admitted by the court, contains inflammatory remarks and invective against the accused and his counsel, a death sentence based on a jury verdict following such arguments violates due process and the Eighth Amendment of the United States Constitution, and their counterparts in the Ohio Constitution, requiring reversal of the death sentence.

{¶ 73} "*Proposition of Law No. 6:* A death sentence is imposed in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution, and Art. I. Sec[tions] 9 and 16 of the Ohio Constitution, following a penalty trial in which the trial court denies a defense motion to limit the state to presentation of evidence of the aggravating circumstances, and permits the state to reintroduce all evidence it presented at the trial phase, including inflammatory irrelevant evidence about the nature and circumstances of the killing itself.

{¶ 74} "*Proposition of Law No. 7:* One who commits aggravated murder prior to January 1, 1996, but is sentenced thereafter, is entitled to the benefit of an instruction permitting the jury to consider the sentencing alternative of life without

parole, and the denial of a defense motion that the jury be permitted to consider that alternative violates the rights of the defendant under R.C. 1.58(B), [Ohio] Const. Art. II, Sec[tion] 15(D), the Fourteenth Amendment right to due process of law, the Eighth Amendment prohibition against cruel and unusual punishment, and their counterparts in the Ohio Constitution, Art. I. Sec[tions] 9 and 16.

{¶ 75} "*Proposition of Law No. 8:* It is impermissible under the Eighth and Fourteenth Amendments to the U.S. Constitution and Art. I. Sec[tions] 9 and 16 of the Ohio Constitution for the trial court to instruct the jury that their verdict is merely a recommendation, as such an instruction impermissibly attenuates the jury's sense of responsibility for its decision, and a death sentence imposed following such an instruction is constitutionally infirm.

{¶ 76} "*Proposition of Law No. 9:* Where jury instructions at the penalty phase of capital proceedings misstate the law to the jury, fail to define mitigating factors, exclude relevant mitigation, and is [*sic*] otherwise erroneous and misleads [*sic*] the jury, the resulting death sentence violates the Eighth and Fourteenth Amendments [to the United States Constitution], and Art. I. Sec[tions] 9 and 16 of the Ohio Constitution, and must be reversed.

{¶ 77} "*Proposition of Law No. 10:* The increased need for reliability required in capital cases by the Ohio and federal Constitutions mandates the granting to the defense more than six peremptory challenges.

{¶ 78} "*Proposition of Law No. 11:* It is error prejudicial to the right of the accused to a fair[,] reliable, and impartial capital sentencing process, secured to him by the Eighth and Fourteenth Amendments to the U.S. Constitution and [Ohio] Const. [Article I] Sec[tions] 9 and 16, for the trial court to permit the state to present evidence of other bad acts and statements of the accused not related to the offense in question, ostensibly to rebut statements of the accused that he feels remorse for taking the life of the victim in the case in which he is being sentenced.

**{¶ 79}** "*Proposition of Law No. 12:* The Ohio death penalty statutes are unconstitutional, violating the Eighth Amendment proscription of cruel and unusual punishments, the Fourteenth Amendment guarantees to due process of law and to the equal protection of the laws, and also violating the concomitant provisions of the Ohio Constitution.

**{¶ 80}** "[*Sub-Proposition of Law 12(A):*] The death penalty is so totally without penological justification that it results in the gratuitous infliction of suffering, and that consequently, there is no rational state interest served by the ultimate sanction.

**{¶ 81}** "[*Sub-Proposition of Law 12(B):*] Both locally, statewide and nationally, the death penalty is inflicted disproportionately upon those who kill whites as opposed to those who kill blacks, and even within Hamilton County, the death penalty is selectively imposed, rendering the penalty as applied in Hamilton County arbitrary and capricious on the one hand, and the product of racial discrimination on the other.

**{¶ 82}** "[*Sub-Proposition of Law 12(C):*] The use of the same operative fact to first elevate what would be 'ordinary' murder to aggravated murder, and then to capital, death-eligible aggravated murder permits the state (1) to obtain a death sentence upon less proof in a felony murder case than in a case involving prior calculation and design, although both crimes are ostensibly equally culpable under the Revised Code, and (2) fails to narrow the capital class to those murderers for whom the death penalty is constitutionally appropriate [*sic*].

**{¶ 83}** "[*Sub-Proposition of Law 12(D):*] The requirement that a jury must recommend death upon proof beyond a reasonable doubt that the aggravating circumstances outweigh only to the slightest degree the mitigating circumstances renders the Ohio capital statutes quasi-mandatory and permits the execution of an offender even though the mitigating evidence falls just short of equipoise with the aggravating factors, with the result that the risk of putting someone to death when

it is practically as likely as not that he deserves to live renders the Ohio capital process arbitrary and capricious, and, in the absence of a requirement that, before death may be imposed, aggravating factors must *substantially* outweigh mitigating factors, unconstitutional.

**{¶ 84}** "[*Sub-Proposition of Law 12(E):*]  The Ohio capital statutes are constitutionally infirm in that they do not permit the extension of mercy by the jury even though aggravating factors may only slightly outweigh mitigating factors.

**{¶ 85}** "[*Sub-Proposition of Law 12(F):*]  The provisions of Crim.R. 11(C)(3) permitting a trial court to dismiss specifications upon a guilty plea only under the nebulous and undefined concept 'in the interests of justice' (1) needlessly encourages guilty pleas and the concomitant waiver of the right to jury, to compulsory process and to confrontation and (2) reintroduces the possibility that the death sentence will be imposed arbitrarily and capriciously.

**{¶ 86}** "[*Sub-Proposition of Law 12(G):*]  The Ohio capital sentencing scheme is unconstitutional because it provides no standards for sentencing or review at several significant stages of the process and consequently death sentences are imposed, and reviewed, without significant statutory guidance to juries, trial courts and reviewing courts to prevent the unconstitutional arbitrary and capricious infliction of the death penalty.

**{¶ 87}** "[*Sub-Proposition of Law 12(H):*]  The decision[s] of the Supreme Court of Ohio in [*State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, and *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311] [have] rendered the Ohio capital statutes unconstitutional in that they encourage, rather than prevent, the arbitrary and capricious imposition of the penalty of death.

**{¶ 88}** "[*Sub-Proposition of Law 12(I):*]  The amendments to the Ohio Constitution occasioned by the passage of Issue One, and the amendments to the Ohio Revised Code enacted by the General Assembly to facilitate the changes in the Ohio Constitution governing capital cases, violate the right of capital defendants

to be free from cruel and unusual punishments, secured to them by the Eighth Amendment to the U.S. Constitution, and to due process of law and the equal protection of the laws secured to them by the Fourteenth Amendment to the U.S. Constitution. The Amendment to R.C. 2953.02, purporting to enable the [Ohio] Supreme Court to weigh evidence in a capital case violates the Ohio Constitution.

{¶ 89} "*Proposition of Law No. 13:* The rejection by the court of appeals of a capital defendant's notice of appeal to that court pursuant to Issue One deprives the defendant of due process of law and the equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States, and also of his rights under the Eighth Amendment where he has been sentenced to death in the trial court.

{¶ 90} "*Proposition of Law No. 14:* The admission of involuntary, incriminating statements, or those given without a valid waiver of the suspect's privilege against self-incrimination, violates that privilege, guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States, and Art. I., Sec[tion] 10 of the Ohio Constitution.

{¶ 91} "*Proposition of Law No. 15:* Where the state fails to prove beyond a reasonable doubt at the penalty phase of a capital prosecution that the aggravating circumstances of which the offender was convicted outweigh the mitigating factors established by the evidence, a death sentence imposed violates the rights of the accused under the Eighth and the Fourteenth Amendment[s] to the Constitution of the United States, and Art. I. [Sections] 9 and 16 of the Ohio Constitution, as well as rights secured to the offender by the Revised Code.

{¶ 92} "*Proposition of Law No. 16:* A prosecutor's argument which goes beyond the facts in evidence is improper and, even where defense objections are sustained, violates the right of the accused to due process under the U.S. and Ohio Constitutions.

{¶ 93} "*Proposition of Law No. 17:* Where, in a capital case, the guilt phase jury instructions, over defense objections, state (1) that the essential element of cause as being where the death is [*sic*] the foreseeable result of the act, and (2) that purpose may be inferred from the use of a deadly weapon, the right of the accused to due process of law under the Fourteenth Amendment to the U.S. Constitution has been violated, requiring reversal of his conviction.

{¶ 94} "*Proposition of Law No. 18:* A death sentence recommended by a jury from service on which one or more veniremen were excused because of their views concerning capital punishment cannot stand unless it affirmatively appears on the record that each such veniremen [*sic*] excused for cause unequivocally indicates that his scruples against capital punishment will automatically prevent him from recommending the death penalty and/or that such views will render him unable to return a verdict of guilty no matter what the evidence, and that he is prevented by his scruples from following the instructions of the court and considering fairly the imposition of the death sentence.

{¶ 95} "*Proposition of Law No. 19:* It is constitutionally impermissible under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution for the state, in a capital prosecution, to exclude from the jury prospective jurors solely on the basis of their race.

{¶ 96} "*Proposition of Law No. 20:* To comport with due process under the United States and Ohio Constitutions, and the Ohio capital statutes, for purposes of proportionality review, death sentences must be compared with all other cases within the jurisdiction in which the death sentence was imposed, as well as those capital cases in which it was not imposed.

{¶ 97} "*Proposition of Law No. 21:* Where, during a criminal trial, there are multiple instances of error, and the cumulative effect of such errors deprives the accused of a fair trial and undermines the reliability of the conviction and the sentence of death imposed upon a jury verdict, the rights of the accused to due

process and to be free from cruel and unusual punishment, under the Fourteenth and Eighth Amendments, respectively, of the United States Constitution, and their corollaries in the Ohio Constitution, have been violated, requiring reversal." (Emphasis *sic.*)