DECISION
Defendant-appellant, Patrick T. Clarke, was tried and convicted by a jury on one count of abduction, a violation of R.C. 2905.02, and one count of domestic violence, a violation of R.C. 2919.25, which was a felony offense as a result of Clarke's prior conviction for domestic violence. For the reasons that follow, we reverse and remand.
According to the state's theory of this case, on February 18, 2000, Clarke tackled the alleged victim, Kathey Niceswanger, in the street in front of their home and dragged her up their driveway. The state was aware prior to the trial, however, that Niceswanger intended to testify that she injured herself in a drunken fall onto a concrete driveway.
The following evidence was offered at trial. Columbus Police Officer David Pulvermacher testified that he and his partner were on bicycle patrol on February 18, 2000, when a man ran up to them and reported that a woman was in trouble in the street. The citizen took Officer Pulvermacher to 451 Elsmere Street, to a house where Clarke lived with his girlfriend, Niceswanger. Officer Pulvermacher testified that Niceswanger answered the door. He stated that "[s]he had a big bloody spot on her head, and her shirt was all torn up, and she had scratches on her and stuff." She had a disheveled appearance and her clothes were torn. Officer Pulvermacher testified that Niceswanger was crying but "not really" emotional. He stated that she was not hysterical and did not appear to be angry at Clarke. He testified that Niceswanger appeared to be in shock.
According to Officer Pulvermacher, Niceswanger stated that Clarke chased her out into the street, tackled her, grabbed her and dragged her back into the house. Pulvermacher authenticated photographs which depicted blood, bruises and scrapes on Niceswanger's face, shoulder and chest, and scrapes and bruises on Clarke's hand. Pulvermacher testified that neither Niceswanger nor Clarke appeared to be intoxicated, although Clarke appeared to be high from drugs. On cross-examination, Pulvermacher admitted that Niceswanger's flat affect could have been caused by drug use. He testified that she showed no emotion and made no comment when Clarke was arrested.
Officer Pulvermacher testified that, in his years of experience as a police officer, he has encountered people who have fallen down from drunkenness and injured themselves. He stated, however, that he had never seen a drunken person sustain Niceswanger's combination of injuries as a result of a fall.
Officer James Shockey was also dispatched on a report of possible domestic violence at 451 Elsmere Street. Officer Shockey testified that Niceswanger's speech was slurred and that she appeared to be intoxicated. He stated, however, that she was coherent enough to show him her injuries. He testified that the injuries on Niceswanger's chest appeared to be fingernail scrapes. He testified that Niceswanger's injuries were not consistent with injuries that would be sustained in a drunken fall.
Officer Shockey transported Clarke by cruiser to the police station. Shockey testified that Clarke repeatedly denied hurting Niceswanger. Clarke also told Shockey that he received the scrapes and bruises on his hand when he helped Niceswanger up off the ground after she had fallen.
The prosecutor called Niceswanger as a witness for the state's case-in-chief. Niceswanger testified that she has been living with Clarke for the past five years. She stated that Clarke is the father of one of Niceswanger's three children, and the two younger children live with Niceswanger and Clarke. Niceswanger testified that, at the time that the incident occurred, she had been going out to drink and use drugs three or four times a week, leaving Clarke to watch the children. She stated that on occasion she would stay out for several days at a time. She testified that her behavior worried Clarke, but it did not make him angry.
Niceswanger testified that she had been at her friend Julius Jones' house for three days prior to the incident at issue. She stated that she had spent the three days drinking and taking prescription drugs. On direct examination, Niceswanger testified that she had just returned to her house when she fell out the back door and onto the driveway, which was covered with gravel and debris. She testified that she landed on her head and shoulder at the same time. She testified that the injuries to her head and shoulder documented in the police photographs were caused by her fall. She could not recall, however, how she got the scrapes on her chest. She testified that it did not hurt when she fell because she "was on too many pills."
Niceswanger testified that she was trying to leave her home and return to Julius Jones' house when she fell. She denied that Clarke was outside with her when she fell. She testified that Jones brought the police to her house. She testified that she lied when she told the police that Clarke had attacked her. The prosecutor examined Niceswanger as follows, regarding her prior statement to the police:
Q. DID THE POLICE COME IN?
A. YES.
Q. DID YOU TELL THEM WHAT HAPPENED?
A. I LIED TO THEM.
Q. YOU LIED TO THEM?
A. YEAH.
Q. WHAT DID YOU LIE TO THEM ABOUT?
A. WHAT HAD HAPPENED.
 Q. WHAT HAD HAPPENED? WHAT DID YOU TELL THE POLICE HAPPENED?
 A. OH. I TOLD THE POLICE I TOLD THE POLICE THAT YOU KNOW, I REALLY CAN'T REMEMBER. BUT WHAT IT SAYS ON THE REPORT, WHAT I TOLD THE POLICE, WAS THAT PAT TACKLED ME.
 Q. DID YOU TELL THE POLICE THAT YOU WERE ARGUING WITH THE DEFENDANT?
A. I DON'T REMEMBER.
Q. YOU DID TELL THE POLICE THAT HE TACKLED YOU?
A. THAT'S WHAT THE REPORT SAID.
 Q. DO YOU RECALL TELLING THE POLICE THAT HE DRAGGED YOU BACK UP THE DRIVEWAY?
A. I DON'T RECALL THAT.
* * *
 Q. DID YOU TELL THEM THAT HE HAD PUSHED YOU AND GRABBED YOU?
 A. I DON'T REMEMBER IF I TOLD THEM THAT OR NOT. [Tr. 34-35.]
Niceswanger stated that, as soon as the police arrested Clarke and took him away, she invited Julius Jones into her house and they resumed their party.
The prosecutor also questioned Niceswanger about her own drug use and about Clarke's drug use:
 Q. NOW, MR. WALDECK TALKED A LITTLE BIT IN HIS OPENING STATEMENT, SAID THAT YOU'VE HAD AN ALCOHOL AND DRUG PROBLEM FOREVER.
A. YES.
Q. HE SAID YOU PARTIED A LOT?
A. YES.
Q. PARTIED WITH JULIUS JONES?
A. YES.
Q. USED DRUGS WITH HIM?
A. YES.
Q. PARTIED WITH PATRICK [CLARKE]?
A. USED TO.
* * *
Q. DID YOU USE DRUGS THEN?
A. YES.
Q. WHAT TYPES OF DRUGS WOULD YOU USE?
A. MAINLY PILLS AND ALCOHOL, AND I HAVE USED COCAINE:
* * *
Q. WHERE WOULD YOU GET THOSE PILLS?
 A. SOMETIMES I WOULD HAVE A PRESCRIPTION, SOMETIMES I WOULD BUY THEM OFF THE STREET.
Q. DID YOU EVER GET THEM FROM PATRICK?
A. NO.
Q. NEVER GOT DRUGS FROM PATRICK?
 A. WE USED TO PARTY TOGETHER. WE WOULD NOT PILLS. BUT A LONG TIME AGO WE WOULD
* * *
A LONG TIME AGO, WE WOULD DO COCAINE TOGETHER.
 Q. (BY MR. WELCH) DID YOU EVER PICK DRUGS UP FOR PATRICK?
A. NO.
Q. EVER FILL PRESCRIPTIONS FOR HIM?
 MR. WALDECK: I AM GOING TO OBJECT TO THIS ON THE GROUNDS OF RELEVANCE.
 THE COURT: IT'S SUSTAINED, UNLESS YOU HAVE SOMETHING YOU WANT TO SIDEBAR ON.
MR. WELCH: YOUR HONOR, COULD WE SIDEBAR, PLEASE?
— — —
 THEREUPON, THE FOLLOWING DISCUSSION WAS HELD AT THE BENCH, OUTSIDE THE HEARING OF THE JURY:
 MR. WELCH: YOUR HONOR, IT'S GOING TO SHOW BIAS. NOT ONLY IS SHE EMOTIONALLY, PHYSICALLY, AND FINANCIALLY DEPENDENT ON HIM, SHE'S DEPENDENT ON HIM TO GET PRESCRIPTION DRUGS THAT SHE USES.
 MR. WALDECK: I DON'T KNOW THAT HE'S SHOWN THE REQUISITE REQUIREMENT TO IMPEACH HIS OWN WITNESS.
THE COURT: HE'S NOT SHE IS OBVIOUSLY HOSTILE AS HELL.
MR. WALDECK: I UNDERSTAND THAT.
 THE COURT: AND THE COURT HAS LATITUDE IN ALLOWING CROSS. I DON'T KNOW THAT HE'S IMPEACHING HER AS MUCH AS TRYING TO SHOW WHY SHE IS RECANTING WHAT SHE TOLD THE POLICE, AND I THINK HE HAS AN OPPORTUNITY TO DO THAT. BUT I'M CONCERNED ABOUT GOING TOO FAR INTO SALES AND SO FORTH THAT HE MADE, BASICALLY SHOWING OTHER ACTS EVIDENCE. SO YOU MIGHT WANT TO GET INTO IF YOU WANT TO GET INTO THE AREA OF WHETHER SHE WAS DEPENDENT ON HIM FOR DRUGS, THAT, I THINK, IS REASONABLE, FAIR GAME, AT THE MOMENT AT LEAST.
— — —
 THEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT, IN THE PRESENCE AND HEARING OF THE JURY:
* * *
 Q. (BY MR. WELCH) SO IT'S YOUR TESTIMONY NOW THAT YOU NEVER RECEIVED ANY TYPE OF PRESCRIPTION DRUGS FROM PATRICK?
A. THAT'S RIGHT.
Q. NEVER PICKED THEM UP FOR PATRICK?
 A. I HAD A PRESCRIPTION ON OF HIS ON ME WHEN I GOT PICKED UP FOR SHOPLIFTING.
 Q. THIS PRESCRIPTION WAS FOR DRUGS THAT YOU USED, RIGHT?
A. NO.
Q. WELL, DIDN'T YOU SAY THAT YOU USED FIORACET?
A. NO.
Q. VALIUM?
A. YEAH.
Q. WHAT WERE YOUR OTHER DRUGS OF CHOICE?
A. XANAX.
 Q. DO YOU KNOW IF A DOCTOR EVERY PRESCRIBED XANAX FOR PATRICK?
A. YES. [Tr. 40-45.]
The prosecutor also questioned Niceswanger about a previous domestic violence incident with Clarke:
 Q. DO YOU REMEMBER A PREVIOUS DOMESTIC VIOLENCE INCIDENT?
A. YES.
 Q. THAT INCIDENT INVOLVED THE DEFENDANT'S SLAMMING YOUR HEAD INTO A WALL MIRROR?
 A. I HAD A CUT ON MY HEAD, AND THERE WAS A MIRROR BROKEN, SO THE POLICE SAID ASSUMED THAT'S WHAT HAPPENED. WE WERE BOTH FIGHTING, BUT THAT'S NOT WHAT HAPPENED.
Q. SO THE POLICE MADE UP THAT STORY?
 A. YEAH. THAT'S NOT WHAT HAPPENED. THERE WAS — WE DID HAVE A FIGHT, BUT THAT'S NOT WHAT HAPPENED.
Q. AND DO YOU KNOW WHAT THE OUTCOME OF THAT CASE WAS?
A. YEAH. HE GOT FIVE MONTHS. [Tr. 39-40.]
The parties later stipulated that Clarke had been convicted of domestic violence on May 28, 1997.
On cross-examination by Clarke's attorney, Niceswanger described her long history of drug and alcohol abuse, and her arrests and convictions for shoplifting, disorderly conduct, driving under the influence, drug possession and prostitution. She described her pattern of going out on drinking binges, and she testified that some of her binges lasted several days. She testified that, while she was on the three-day binge prior to the incident at issue, she did not shower or do any kind of personal maintenance. She stated that she only remembered bits and pieces of the days prior to the incident and that it was possible that she had fallen elsewhere during that period of time and injured herself. She testified that she was very impaired when the police arrived at her home, numb from the alcohol and drugs. She denied that Clarke had harmed her in any way. Niceswanger testified that she told the police that Clarke had harmed her in order "to get him to go to jail because I wanted to be with Julius."
On appeal, appellant assigns the following errors:
FIRST ASSIGNMENT OF ERROR
 The trial court erred in admitting an out-of-court statement from an alleged victim as an excited utterance under Evid.R. 803(2).
SECOND ASSIGNMENT OF ERROR
 The trial court erred in permitting the prosecutor to inquire into Appellant's involvement in the illegal trafficking of drugs.
THIRD ASSIGNMENT OF ERROR
 Appellant was denied effective assistance of counsel as guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10, of the Ohio Constitution because counsel failed to timely object to the introduction of inadmissible evidence that was inflammatory and highly prejudicial.
FOURTH ASSIGNMENT OF ERROR
 There was insufficient evidence to support the guilty verdict, and the verdict was against the manifest weight of the evidence, thereby, (sic) depriving Appellant of his due process protections under the state and federal Constitutions.
By his first assignment of error, appellant contends that the trial court erred when it allowed the prosecutor to introduce the statements that Niceswanger made to the police. Appellant argues that the statements are inadmissible hearsay. Appellant contends that the court erroneously concluded that the statements were admissible under the hearsay rule exception for excited utterances. Appellant contends that Niceswanger did not demonstrate the indicia of excitement. Appellant further contends that Niceswanger was so intoxicated at the time that she made the statements to the police that the reliability of the statements is suspect. We disagree and conclude that the state was entitled to question the police officers regarding Niceswanger's statements.
Evid.R. 803, which establishes those categories of hearsay that are exempted from the exclusionary rule, states:
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * *
(2) Excited utterance
 A statement relating to a startling event or condition made while the declarant was under stress of excitement caused by the event or condition.
In State v. Taylor (1993), 66 Ohio St.3d 295, 300-301, the Ohio Supreme Court outlined the parameters for admission of evidence as an excited utterance:
 "Such testimony as to a statement or declaration may be admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration." (Emphasis sic.) * * *
The determination of whether a hearsay declaration should be admitted as an excited utterance is a matter within the trial court's sound discretion. Roach v. Roach (1992), 79 Ohio App.3d 194, 205. We conclude that the trial court did not abuse its discretion when it admitted Niceswanger's statements to the police officers under the excited utterance exception.
Clarke contends that Niceswanger did not demonstrate nervous excitement sufficient to still her reflective faculties. We disagree. Officer Pulvermacher testified that Niceswanger was crying and upset. Furthermore, in considering whether to admit the out-of-court statements, the trial court questioned Officer Pulvermacher as follows:
 THE COURT: YOU SAY SHE APPEARED TO YOU TO BE ALMOST LIKE SHE WAS IN SHOCK?
THE WITNESS: YES, SIR.
 THE COURT: NOT PARTICULARLY REFLECTIVE, JUST STUNNED, IS THAT WHAT YOU'RE SAYING?
THE WITNESS: RIGHT. [Tr. 8.]
Clarke further argues that Niceswanger was too impaired from drugs and alcohol to make reliable statements to the police. Although Niceswanger testified that she was impaired when the police arrived at her home, other evidence in the record belies Clarke's argument. Officer Pulvermacher testified that Niceswanger did not appear to be impaired. Officer Shockey testified that, although Niceswanger appeared to be intoxicated, she was coherent and able to show him her injuries. In view of this evidence, we conclude that it was within the trial court's discretion to admit Niceswanger's hearsay statements to the police under the excited utterance exception. Accordingly, we overrule appellant's first assignment of error.
By his second assignment of error, appellant argues that the trial court erred when it permitted the prosecutor to ask Niceswanger about Clarke's involvement in illegal drug trafficking. "The trial court has broad discretion in the admission of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of a trial court." State v. Joseph (1995), 73 Ohio St.3d 450, 460. We conclude that the trial court abused its discretion when it admitted testimony regarding Clarke's possible involvement in illegal drug trafficking, as such testimony amounted to improper other acts testimony and was unduly prejudicial to Clarke.
Under the Ohio Rules of Evidence, extrinsic acts generally may not be used to prove that the accused has a propensity to break the law. Evid.R. 404(B) provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Because Evid.R. 404(B) codifies an exception to the common law with respect to other acts of wrongdoing, it "must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." State v. Broom (1988), 40 Ohio St.3d 277, paragraph one of the syllabus. Moreover, even if other act evidence is relevant and otherwise admissible, it must be excluded under Evid.R. 403(A) "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
The state contends that it questioned Niceswanger about whether Clarke supplied her with illegal drugs in order to show that Niceswanger was dependent upon Clarke for her drug habit and therefore biased in Clarke's favor, not to show that Clarke has a propensity to break the law. We conclude that the extent of the testimony elicited from Niceswanger about Clarke's involvement with drugs went beyond the prosecutor's purported effort to demonstrate bias and amounted to improper other acts testimony. The prosecutor asked Niceswanger whether she partied with Clarke and whether she used drugs with Clarke. Over objection from Clarke's counsel, the prosecutor repeatedly asked Niceswanger whether she obtained illegal prescription drugs from Clarke. We further conclude that evidence regarding Clarke's possible involvement with drugs should have been excluded for the additional reason that its probative value was substantially outweighed by the danger of unfair prejudice, as the jury was repeatedly exposed to the idea that Niceswanger may have used and supplied illegal drugs. We therefore sustain appellant's second assignment of error.
In his third assignment of error, appellant contends that he was denied effective assistance of counsel. Specifically, Clarke argues that his trial counsel was ineffective because he: (1) failed to object to the prosecutor's use of Niceswanger's prior statements to the police to impeach Niceswanger's testimony; (2) failed to object to the prosecutor's opening statement description regarding the statement that the male citizen made when he summoned the police to 451 Elsmere Street; and (3) failed to object to questions surrounding Clarke's prior domestic violence conviction. Clarke contends that he was prejudiced by the cumulative effect of his counsel's ineffectiveness and, thus, deprived of his constitutional right to a fair trial.
In State v. Ballew (1996), 76 Ohio St.3d 244, 255, the Ohio Supreme Court outlined the following test regarding ineffective assistance of counsel:
 Reversal of a conviction or sentence based upon ineffective assistance requires (a) deficient performance, "errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment," and (b) prejudice, "errors * * * so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington (1984), 466 U.S. 668, 687. * * *
The defendant must show that counsel's representation fell below an objective standard of reasonableness. Strickland v. Washington (1984),466 U.S. 668, 687-688. The defendant must also prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 694. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Id. at 689. Furthermore, "the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id.
We conclude that Clarke's counsel's representation, in part, fell below the objective standard of reasonableness. Clarke's counsel's performance resulted in the improper impeachment of Niceswanger's trial testimony and improper testimony regarding Clarke's prior conviction for domestic violence. These deficiencies notwithstanding, however, conclude that Clarke has not established that he received ineffective assistance of counsel, as he has not demonstrated that the outcome of his trial would have been different without counsel's errors.
As an initial matter, we conclude that Clarke's counsel's decision not to object to the prosecutor's opening statement characterization of the male citizen's statements to the police did not fall below the standard of objective reasonableness. Clarke contends that his trial counsel should have objected because the prosecutor told the jury that the citizen reported that a woman was getting beaten in her driveway, yet the testimony at trial only established that the citizen reported that a man was yelling at a woman who appeared to be in trouble.
We believe that counsel's decision not to object during the prosecutor's opening statement could arguably be a trial tactic. Immediately before the prosecutor made his opening statement, the court had instructed the jury that opening statements are not evidence. The jury is presumed to follow the trial court's instructions. See State v. Raglin (1998), 83 Ohio St.3d 253, 264. Moreover, defense counsel could quite properly have decided that an objection would draw attention to the statement, unduly emphasizing it in the minds of the jurors. By not objecting to the reference, counsel could have been downplaying the significance of the remark. See State v. Ford (Nov. 12, 1999), Hamilton App. No. C-980957, unreported.
We further conclude, however, that Clarke's counsel's representation fell below the standard of objective reasonableness when counsel failed to object to the state's examination of Niceswanger based on her prior inconsistent statements to the police. In failing to object, Clarke's counsel permitted the state to impeach Niceswanger without the necessary prerequisite showing of surprise.
Evid.R. 607(A) provides as follows:
(A) Who May Impeach
 The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Evid.R. 801(D)(1)(a), 801(D)(2), or 803.
"Under Evid.R. 607, a party may not impeach its own witness with a prior inconsistent statement without showing surprise and affirmative damage." State v. Keenan (1993), 66 Ohio St.3d 402, 412. Surprise is established if the witness's testimony is materially inconsistent with a prior statement and counsel did not have reason to believe that the witness would recant when called to testify. State v. Reed (1981),65 Ohio St.2d 117, 125.
In the instant action, the state not only failed to demonstrate the prerequisite element of surprise, it admitted that it had reason to believe that Niceswanger would recant when called to testify. The prosecutor acknowledged in his opening statement that he realized that Niceswanger might testify at trial that she injured herself because she fell while she was intoxicated. The prosecutor told the jury that Niceswanger was no longer cooperating with the state, that the state was "compelling her" to attend the trial and that she was only coming to court "under duress." Under these circumstances, Clarke's counsel should have objected to the state's examination of Niceswanger based on her prior inconsistent statements to the police.
We also conclude that Clarke's counsel's representation was objectively unreasonable because he failed to object to the state's inflammatory line of questioning regarding Clarke's prior conviction for domestic violence. Although the state was required to prove that Clarke had a prior domestic violence conviction to prove its felony domestic violence charge in the instant action, the parties stipulated to the fact of the prior conviction. The state's inquiry of Niceswanger regarding Clarke's "slamming" Niceswanger's head into a wall mirror and regarding the severity of Clarke's sentence for the prior conviction should have drawn objection from Clarke's counsel as violative of Evid.R. 403(A)'s prohibition against unfair prejudice and Evid.R. 404(B)'s prohibition against the use of other acts as character evidence.
Although we conclude that Clarke's counsel's representation was objectively unreasonable, however, we are unable to conclude that the performance amounted to ineffective assistance of counsel, as Clarke has not proven that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Because the state was able to utilize the excited utterance exception to the hearsay rule and introduce Niceswanger's prior statements to the police by way of the police officer's testimony, the jury was already exposed to Niceswanger's prior version of the incident. Similarly, although the state should have been prohibited from asking about the details of Clarke's prior conviction for domestic violence, the jury was informed that Clarke had a prior conviction by way of the parties' stipulation. Accordingly, we overrule appellant's third assignment of error.
By his fourth assignment of error, appellant contends that there was insufficient evidence to support his guilty verdicts. The Ohio Supreme Court outlined the role of an appellate court presented with a sufficiency of evidence argument in State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime proven beyond a reasonable doubt. * * *
See, also, Jackson v. Virginia (1979), 443 U.S. 307, 319. This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983), 20 Ohio App.3d 172, 175. Rather, the sufficiency of evidence test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, at 319. Accordingly, the weight given to the evidence and the credibility of witnesses are issues primarily for the trier of fact. State v. Thomas (1982), 70 Ohio St.2d 79, 80. We employ the same standard of review for an argument for acquittal under Crim.R. 29. See State v. Bezak (Feb. 18, 1998), Summit App.
No. 18533, unreported (there is "no difference between the standard of review for a challenge to the sufficiency of the evidence and that for a motion for acquittal under Crim.R. 29[A]).
Even without the improper testimony pertaining to Clarke's involvement with drugs, the state provided sufficient evidence, when viewed in the light most favorable to the prosecution, to support Clarke's conviction. Specifically, we note that it was within the province of the jury to believe the police officers' testimony regarding the version of events related by Niceswanger to the police on the night of the incident and to conclude that the incident in fact occurred as Niceswanger described to the police.
Appellant also contends that the guilty verdicts were against the manifest weight of the evidence. In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror." Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387. The appellate court, however, must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. See State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The power to reverse on "manifest weight" grounds should only be used in exceptional circumstances, when "the evidence weighs heavily against the conviction." Thompkins, at 387.
Based on our ruling on appellant's second assignment of error and our discussion regarding appellant's third assignment of error, in the event of a new trial the evidence will necessarily be different. Accordingly, we decline to evaluate whether this jury "clearly lost its way" in convicting appellant, and overrule as moot appellant's manifest weight argument.
For the foregoing reasons, appellant's first and third assignments of error are overruled. Appellant's fourth assignment of error is overruled as it pertains to sufficiency of the evidence and overruled as moot with regard to manifest weight of the evidence. Appellant's second assignment of error is sustained. The judgment of the Franklin County Court of Common Pleas is reversed and this case is remanded to the trial court for further proceedings in accordance with the law.
TYACK and McCORMAC, JJ., concur.
 McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.