[Cite as *State v. Winston*, 2018-Ohio-2525.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio, :

        Plaintiff-Appellee, :

                                  No. 16AP-664

v. : (C.P.C. No. 14CR-2163)

Levone Winston, : (REGULAR CALENDAR)

        Defendant-Appellant. :

---

D E C I S I O N

Rendered on June 28, 2018

---

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Valerie B. Swanson,* for appellee.

**On brief:** *Brian J. Rigg,* for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

HORTON, J.

{¶ 1} Defendant-appellant, Levone Winston, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of three counts of rape with firearm specifications, two counts of attempted rape with firearm specifications, and kidnapping with a firearm specification. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} The Franklin County Grand Jury indicted appellant on 11 criminal charges in April 2014. Counts 1 and 2 of the indictment charged appellant with kidnapping. Counts 3 and 8 of the indictment charged appellant with aggravated robbery. Counts 4, 5, 6, 7, and 11 of the indictment charged appellant with five separate counts of rape. In Counts 9 and 10 of the indictment, appellant was charged with two separate counts of attempted rape. A

three-year firearm specification accompanied each of the 11 counts. A jury trial was held from July 25, through 29, 2016.

{¶ 3} During the trial, the victims, A.B. and her boyfriend T.F., testified that on October 22, 2012, at approximately 11:00 p.m., they were walking to their car when two men ran up to them and ordered them to "give me what you have." (Tr. at 78.) One man ran up to A.B., who was near the passenger door, and the other ran up to T.F., who was on the driver's side. Both offenders had firearms. The man near A.B. pushed her to the ground and searched her to see if she had anything of value. The man who approached T.F. hit him in the face with a gun and asked him if he had any money. T.F. said that the offenders threatened to kill him. They told him not to look at them, and they took his shoes off. He then saw that one of the offenders "was taking off [A.B.'s] shirt or grabbing her, you know, kind of grabbing by her shirt and I just kind of heard her like resisting." (Tr. at 191.) Shortly thereafter, the man left T.F. and came over to A.B., where he and the other offender proceeded to take off her clothes. T.F. used that opportunity to run away. A.B. heard one offender yell at the other to shoot T.F. as he ran away, but no shots were fired. T.F. ran to an apartment complex and started banging on doors trying to get someone to help. Eventually, a resident let him in, and the police were called.

{¶ 4} After T.F. fled, A.B. was drug by her hair to a grassy area, and the rest of her clothes were removed. The first offender made A.B. get on her knees and perform fellatio. The second offender also had her perform fellatio on him. She was then switched back to performing fellatio on the first offender. Next, the offenders took A.B. over to a stairwell at the apartment building across the street. A.B. was completely naked when she was taken by the hair with a gun on top of her head over to that stairwell. When A.B. got over there, the two offenders made her perform fellatio on each of them again.

{¶ 5} After performing fellatio, the offenders made A.B. stand against the wall. They had her spit on their penises and they took turns trying to put their penises inside of her vagina, but were unsuccessful. One of the offenders then took their gun and was rubbing it around A.B.'s vaginal and rectal area. When the offenders were unable to penetrate A.B.'s vagina, they switched back to making her perform fellatio where, again, each offender took a turn. After A.B. performed the fellatio this final time, one of the offenders urinated on her leg.

{¶ 6}   After A.B. was urinated on, one of the offenders became nervous and urged the other offender to leave, then fled himself.  At this time, the remaining offender grabbed A.B. by her hair and took her out to the grassy area in the middle of the apartment complex. He ordered her to turn around.  A.B. then heard two gunshots. She thought she was going to die, however, the shots went somewhere else. While waiting for the police to arrive, T.F. also heard the gunshots.

{¶ 7}   After the shots were fired, A.B. heard sirens coming from a distance. The offender that was still with her ran away. A.B. retrieved her shorts, shoes, and bra, put them on, and then ran to her apartment. She left her underwear and shirt lying on the ground where the offenders had removed them.

{¶ 8}   A.B. testified that neither man wore a condom. She did not know if either of them ejaculated. A.B. never saw the offenders' faces. Every time she looked up, they pushed her head down.  She believed that they were black males between the age of 20 and 30, they were wearing dark clothes, and that one was taller than the other. It also was pitch black outside when this happened. A.B. did see the firearms that the offenders were carrying. One firearm was all black, and the other firearm was a silver handgun. T.F. was also not able to get a good look at either one of the offenders. He described them as two African-American males, one kind of tall, and the other one shorter with a medium build. A.B. and T.F. denied knowing appellant.

{¶ 9}   Columbus Police Detective Ricky Crum responded to the scene on the report of a rape in progress. While Crum was en route to the scene, it was aired that shots had been fired. After the police arrived, A.B. was taken to Riverside Methodist Hospital where a sexual assault exam was performed.

{¶ 10}  The state presented seven other witnesses at trial including four detectives, the sexual assault nurse examiner ("SANE") Lynn Ressler, who examined A.B. and took the swabs or samples of potential DNA evidence, and the individuals who performed the forensic testing.  Columbus Police Detective David Bobbitt with the sexual-assault unit investigated this case and developed appellant as a suspect. Detective Lawrence Gauthney gave Bobbitt the name of Juan Mandujano, and relayed that he was a known associate of appellant. Bobbitt ultimately charged appellant and Mandujano out of this incident. Mandujano was deceased at the time of appellant's trial.

{¶ 11} The forensic scientist who analyzed the DNA samples in the case, Hallie Garofalo, from the Ohio Bureau of Criminal Investigation ("BCI") testified that appellant's DNA was included in the mixture with A.B.'s DNA in the cutting from the crotch of her shorts. The proportion of the population that could not be excluded as possible contributors was 1 in every 888,900,000 unrelated individuals. In Garofalo's experience, the quantity of DNA obtained from this sample was not indicative of "casual transfer or a touch DNA sample." (Tr. at 530.) The amount of DNA that was detected was "consistent with a potential body fluid that could have been left behind." (Tr. at 532.) In Garofalo's expert opinion, the DNA obtained from this sample also was not from urine. The shorts were tested and "[were] presumptive negative for urine." (Tr. at 544.) Garofalo explained that pre-ejaculate can test presumptively positive for semen but it does not contain sperm cells.

{¶ 12} The stairwell was also swabbed and appellant was "included as a potential minor contributor to that mixture." (Tr. at 539.) Garofalo testified that the DNA profile from a swabbing of the stairwell contained a mixture of DNA. The major profile was from an unknown male. The minor profile was consistent with contributions from appellant. A.B.'s vaginal swabs contained DNA consistent with Juan Mandujano.

{¶ 13} Appellant testified on his own behalf. He admitted to selling drugs at the time of the alleged incident and, contrary to T.F.'s testimony, claimed that he knew T.F. because T.F. would buy heroin from him. He denied knowing A.B. He also testified that he had been in the stairwell where the incident is alleged to have taken place because he hung out with people in that area and that everybody just used the bathroom "right there." (Tr. at 700.) Appellant repeatedly denied his involvement with the allegations in this case. He claimed that on the day in question there had been a dispute over drugs between T.F. and Mandujano, and that he was being framed.

{¶ 14} Appellant also testified at trial that he was close friends with Mandujano. During a jail call with his fiancée, appellant denied knowing A.B. and T.F. After initially denying it, appellant also admitted telling his fiancée to write down the names of the victims, "find them" and "take their asses out." (Tr. at 738-39.)

{¶ 15} On August 1, 2016, the jury returned a verdict finding appellant guilty of Count 1 (kidnapping), Counts 4 and 5 (rape), Counts 9 and 10 (attempted rape), and Count 11 (rape) of the indictment. Further, the jury found appellant guilty of the firearm specification for each of the guilty verdicts. The jury found appellant not guilty of Counts 2,

3, 6, 7, and 8 of the indictment. On August 24, 2016, the court sentenced appellant to a total of 40 years in prison.

## II. ASSIGNMENTS OF ERROR

{¶ 16} Appellant appeals, assigning the following errors:

[I.] THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL.

[II.] THE VERDICTS OF GUILTY TO KIDNAPPING, THREE COUNTS OF RAPE, AND TWO COUNTS OF ATTEMPTED RAPE ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

[III.] THE TRIAL COURT ERRED WHEN IT ALLOWED THE ALLEGED VICTIM TO TESTIFY AS TO HER FEELINGS SURROUNDING THE INCIDENT.

[IV.] THE TRIAL COURT ERRED WHEN IT ALLOWED LYNN RESSLER, THE SANE NURSE, TO TESTIFY AS AN EXPERT OVER THE OBJECTION OF DEFENSE COUNSEL.

[V.] THE TRIAL COURT ERRED WHEN IT ALLOWED DETECTIVE GAUTHENY [sic] TO TESTIFY AND WHEN IT ADMITTED THE FIREARM INTO EVIDENCE OVER THE OBJECTION OF DEFENSE COUNSEL.

## III. ASSIGNMENTS OF ERROR ONE AND TWO—CRIM.R. 29 AND MANIFEST WEIGHT

{¶ 17} Appellant's assignments of error one and two are related. In addition, our finding on assignment of error two, the manifest weight issue, is also dispositive of assignment of error one. As such we will address them together. Appellant's main arguments are that there was insufficient evidence that he was the perpetrator of these crimes and, as such, the trial court erred by denying his Crim.R. 29 motion for acquittal and the jury's verdict was against the manifest weight of the evidence. Specifically, he contends that the presence of his DNA in the crotch of A.B.'s shorts after this sexual assault was insufficient evidence to prove that appellant committed the kidnapping, rapes, and attempted rapes, all with firearm specifications.

{¶ 18} This court in *State v. Baatin*, 10th Dist. No. 11AP-286, 2011-Ohio-6294, ¶ 8-11, stated the applicable law:

Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *State v. McCrary*, 10th Dist. No. 10AP–881, 2011–Ohio–3161, ¶ 11 * * * Thus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency. *Id.* * * *.

The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997–Ohio–52. * * *

When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*; *State v. Strider–Williams*, 10th Dist. No. 10AP–334, 2010–Ohio–6179, ¶ 12.

In addressing a manifest weight of the evidence argument, we are able to consider the credibility of the witnesses. *State v. Cattledge,* 10th Dist. No. 10AP–105, 2010–Ohio–4953, ¶ 6. However, in conducting our review, we are guided by the presumption that the jury * * * "'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' "*Id.* * * * Accordingly, we afford great deference to the jury's determination of witness credibility.

{¶ 19} Our review of the entire record shows that the weight of the evidence supported appellant's convictions. There was significant evidence that he was one of the perpetrators. First, appellant denied knowing A.B. Yet, appellant's DNA was found in the crotch of the shorts A.B. put on, without underwear, right after she was sexually assaulted. The victim testified that she did not know whether the offenders ejaculated. Pre-ejaculate

contains the fluid component of semen without the sperm cells. The stain could well have been pre-ejaculate.

{¶ 20} In addition, DNA that is consistent with appellant's DNA was found in the stairwell where A.B. was raped. The theory that appellant's DNA was in A.B.'s shorts because it was transferred there from the stairwell where appellant had urinated in the past fails. The stains in the victim's shorts were tested for the presence of urine, and urine was not found. The DNA expert also testified that due to the amount of male DNA found in the victim's shorts it likely came from a bodily fluid that was a rich source of DNA. Urine is not a fluid rich in DNA.

{¶ 21} Furthermore, Mandujano's DNA was found on A.B.'s vaginal swab. After being arrested on these charges, appellant asked his fiancée about Juan's whereabouts during a jail call. He also admitted telling his fiancée to write down A.B.'s and T.F's names, to "find them" and to "take their asses out." This too lends support to finding appellant was one of the offenders who committed these crimes. In addition, the jury believed A.B.'s version of events. The testimony of one witness, if believed by the jury, is enough to support a conviction. *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.

{¶ 22} The weight of the evidence was sufficient to find appellant guilty of Count 1 of the indictment (kidnapping), under R.C. 2905.01. A.B. clearly testified that the offenders restrained her liberty, by threat of violence and with a gun, and by being dragged to the stairwell, for the purpose of engaging in sexual activity against her will. Appellant's convictions in Counts 4, 5 and 11 of the indictment (rape), under R.C. 2907.02, were supported by the manifest weight of the evidence. There was more than sufficient evidence that each offender forced A.B. to perform fellatio at least three times to support these convictions. A.B. testified to three separate incidents where she was forced to perform fellatio on both offenders: (1) when A.B. was still out on the grass near T.F.'s car, (2) when the offenders took her over to the stairwell, and (3) in the stairwell after the offenders failed to penetrate her vagina.

{¶ 23} In addition, appellant's convictions in Counts 9 and 10 of the indictment (attempted rape), under R.C. 2923.02 as it relates to R.C. 2907.02, were supported by the manifest weight of the evidence. The indicted offenses charged appellant in terms of the principal offense, and under R.C. 2923.03(F), this language was sufficient to charge appellant as a complicitor. The evidence showed that both offenders took turns trying to

penetrate A.B.'s vagina with their penises. They each had A.B. spit on their penises to try and facilitate the penetration. The evidence showed that appellant was complicit in the acts committed by Mandujano. Appellant and Mandujano each had a firearm and they acted and planned together. Finally, appellant's convictions for the firearm specifications were not against the manifest weight of the evidence. A.B. and T.F. testified that the offenders had firearms. A.B. provided a description of these firearms. A.B. testified that she heard two gunshots. T.F. also heard shots fired. The evidence showed that the offenders had and used guns throughout to facilitate the crimes.

{¶ 24} A.B.'s account of that evening was corroborated by T.F. and also by the physical evidence and the forensic evidence. Our review shows that the jury did not clearly lose its way when it found the state's evidence persuasive, and did not create a manifest miscarriage of justice. The jury was in the best position to evaluate the witnesses' credibility and the evidence does not weigh heavily against conviction. Appellant presents no persuasive reason for this court to reject the jury's determination. Accordingly, appellant's convictions are not against the manifest weight of the evidence. Appellant's second assignment of error challenging the manifest weight of the evidence lacks merit and is overruled.

{¶ 25} As stated above, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *McCrary* at ¶ 11. "Because analysis of the evidence for purposes of a Crim.R. 29(A) motion looks at the sufficiency of the evidence, a Crim.R. 29(A) motion and a review of the sufficiency of the evidence are subject to the same analysis." *State v. Clellan,* 10th Dist. No. 09AP-1043, 2010-Ohio-3841, ¶ 7. Such motions are directed to the issue of whether "the evidence is insufficient to sustain a conviction." Crim.R. 29(A). As such, there was sufficient evidence to support the convictions, and to overrule appellant's Crim.R. 29 motion for acquittal. Therefore, appellant's first assignment of error is overruled

## IV. ASSIGNMENT OF ERROR THREE–VICTIM IMPACT TESTIMONY

{¶ 26} Appellant contends that the trial court erred by allowing the admission at trial of victim impact evidence. Over the Evid.R. 402 objection of appellant's counsel, the trial court allowed the victim to testify to how the event had affected her life. Appellant argues that the trial court abused its discretion when it allowed this testimony, as it was irrelevant

to the question of appellant's guilt, and was an attempt to invoke sympathy from the jury. We note that appellant cites no case law in support of his arguments.

{¶ 27} The facts show that on direct examination, the prosecutor asked A.B. how this incident has affected her life. Appellant's counsel objected, and the court overruled the objection. A.B. then testified:

> I mean, I've had to go like to counselors and like - - like try to
> - - I mean, I try not to talk about it or pretend like it didn't
> happen, but like I'll go to counselors and like try to - - it doesn't
> help like - - I don't know. But it's definitely like made me
> different and like scared of like different things and situations
> like a lot.

(Tr. at 130-31.)

{¶ 28} The prosecutor asked what she meant by that, and A.B. said:

> Just like I don't like - - well, for like a year after that I wouldn't
> walk to the car by myself. Like people had to walk me
> everywhere. Like I wouldn't go outside at night. Like I still don't
> want - - won't walk places at night like alone. I don't know. I
> just try not to talk about it because I just try so hard to pretend
> it didn't happen, but like you can't do that. Like I remember,
> you know. But I've tried like counseling and like - - I don't know
> - - things like that.

(Tr. at 131.)

{¶ 29} After this testimony was admitted, appellant's counsel argued that the prosecutor asked these questions "to solicit information concerning the element of sympathy," which he felt was inappropriate, because it "doesn't make it more or less likely that my client committed the offense." (Tr. at 135.) The prosecutor responded:

> In asking those questions, the State is essentially just to the
> witness' credibility talking about how something that has
> happened to them has affected them and their emotional state
> at the time that it happened, after it happened all goes to their
> credibility as to whether someone was to say, nope, I'm just fine
> or something like that, then they would potentially be more
> believable or less believable.
>
> This is an incident that happened to the victim. She was
> testifying about that entire incident, what she was doing prior,
> what she was doing - - how things have been afterward and it's
> simply to kind of give a full picture to the jury of how this has
> affected her and also to show that in the elements of the offense,

> there are some compelling by threat or force of threat, and if she is still sustaining some sort of psychological harm from it, then it clearly was something that she did not agree to or was okay with when it was happening.
>
> So this is I think it just adds to the totality - - to the credibility of the witness and further to the totality of the presentation of her relating the incident and how it's affected her. I - - think it's just bringing in all the information all together for the jury then to decide.

(Tr. at 136-37.)

{¶ 30} The trial court found that the testimony was admissible under Evid.R 403, because it "will be helpful for the jury to consider whether or not they believe or disbelieve all or part of her testimony regarding whether these alleged incidents actually happened to her." (Tr. at 139.) It also noted that "the jury has been admonished at least twice and they will be admonished at - - again in jury instructions to not allow sympathy to influence their verdict." *Id.*

{¶ 31} A trial court has broad discretion in admitting or excluding evidence, and unless the trial court has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court will not disturb the trial court's decision. *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). Evidence will be inadmissible under Evid.R. 403(A) only if the danger of unfair prejudice substantially outweighs the probative value. *State v. Morales*, 32 Ohio St.3d 252, 257 (1987). "[T]he probative value must be minimal and the prejudice great before the evidence may be excluded." *Id.* at 258.

{¶ 32} Evidence regarding the effect of the crime on the victim or her family is admissible. *See State v. Lee*, 10th Dist. No. 03AP-436, 2004-Ohio-5540, ¶ 37-38. "In particular, testimony about the nature and extent of the victim's injuries and his or her trauma is admissible because it is relevant in proving the facts attendant to the offense. *State v. Smith*, 8th Dist. No. 103483, 2016-Ohio-5512, ¶ 29, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 135. "Just as the victim of a felonious assault may testify to the treatment needed as a result of the assault in order to prove that the assault actually did occur, so may the victim of a sexual assault testify to the lingering trauma suffered as a result of that abuse." *Smith* at ¶ 29, citing *State v. Eads*, 8th Dist. No. 87636, 2007-Ohio-539, ¶ 56.

{¶ 33} In this case, during cross-examination, appellant's counsel asked A.B. if she ever talked with T.F. about what happened, and A.B. relayed that they have talked about it, but said:

> I try not to. * * * I'm not comfortable sharing with certain things with someone that I wouldn't tell my mom. I wouldn't tell them. I don't want - - It's just like something that - - I don't know how to describe it, but it's like something I don't want to talk about.

(Tr. at 159.)

{¶ 34} Appellant's counsel also elicited similar information from T.F. when he asked if T.F. ever learned the details of what happened to A.B., T.F. said "[n]ot really, no" because "she gets very upset and she does not like to talk about it." (Tr. at 231.) Therefore, even without the evidence at issue, the jury still heard evidence as to the impact these crimes have had on A.B. in response to appellant's questioning.

{¶ 35} In this case, the victim impact evidence had a tendency to make the existence of a fact of consequence, i.e., that the offenses occurred, more probable than it would be without the evidence. *See State v. Wade*, 8th Dist. No. 90145, 2008-Ohio-4870, ¶ 17. Here, the only physical evidence on the victim were the scrapes to her knees. Accordingly, the effect the crime had on A.B. was relevant to prove that the rape and attempted rape offenses occurred and to corroborate A.B.'s testimony. The challenged testimony also was very brief, and it likely came as no surprise to the jury to learn that a victim alleging a brutal rape by two strangers would need counseling and would still have some lingering fear.

{¶ 36} Finally, the jury members were instructed multiple times not to let sympathy influence their decision. The jury is presumed to have followed these instructions. *State v. Trewartha*, 10th Dist. No. 05AP-513, 2006-Ohio-5040, ¶ 21, citing *State v. Raglin*, 83 Ohio St.3d 253, 264 (1998).

{¶ 37} We find that under these circumstances, the trial court did not abuse its discretion by allowing the victim to testify that after this sexual assault she underwent counseling, and that since this incident she is afraid in different situations. The testimony did not make it more likely that appellant committed the offenses. It just tended to prove that the sexual assault actually occurred.

{¶ 38} The state argues that even if the trial court erred by admitting victim impact evidence, such error was harmless. We agree. The disputed evidence was not prejudicial, as

there is no probability that appellant would not have been convicted had this testimony been excluded. In light of the DNA evidence, and A.B.'s testimony regarding the incident, the victim impact testimony did not contribute to appellant's conviction and was harmless beyond a reasonable doubt. Appellant's third assignment of error is overruled.

## V. ASSIGNMENT OF ERROR FOUR–SANE NURSE EXPERT TESTIMONY

{¶ 39} The facts show that the prosecutor moved to have Lynn Ressler, the SANE nurse, declared an expert in forensic sexual assault exams, and appellant's counsel objected. The trial court was satisfied pursuant to Evid.R. 702 that "this witness does have the scientific, technical and other specialized knowledge; that her testimony is based on sufficient facts, based on the exam she conducted, her testimony is a product of reliable principles and methods and she has reliably applied those principles and methods. So she will be declared an expert." (Tr. at 260.)

{¶ 40} Appellant argues that the trial court erred when it allowed Ressler to testify as an expert. Appellant states that the certification can be completed in a couple of months and that the examination of sexual assault victims is only a small percentage of her job. Appellant claims that the qualifications and responsibilities of a SANE nurse do not qualify them as experts under Evid.R. 702. As stated by the SANE nurse in this case, the purpose of their job is to collect evidence for law enforcement. Special training to collect evidence for law enforcement does not render one an expert.

{¶ 41} Evid.R. 702 states in pertinent part:

> A witness may testify as an expert if all of the following apply:
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; (C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

{¶ 42} "Qualification as an expert witness does not require any special education, certification, or complete knowledge of the field in question. It is only necessary that the witness's specialized knowledge, skill, experience, training, or education will aid the trier of fact in performing its fact-finding function." *State v. Quinones*, 8th Dist. No. 94082, 2010-Ohio-5240, ¶ 21, citing *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 113. "A trial court's decision to allow a witness to testify as an expert will not be reversed absent an

abuse of discretion." *Quinones* at ¶ 21. Other courts have allowed SANE nurses to testify as an expert. *See Quinones*; *State v. Goss*, 2d Dist. No. 24830, 2012-Ohio-3869, ¶ 4.

{¶ 43} In *Quinones* at ¶ 22, the Eighth District Court of Appeals found that the trial court did not abuse its discretion by allowing the SANE nurse to testify as an expert. It noted that the nurse had been a sexual-assault nurse for 7 years and a registered nurse for 14 years. Based on the nurse's experience, the court held that the trial court properly permitted her to testify as an expert. In *Goss,* the Second District Court of Appeals noted that the nurse had more than one decade of experience in conducting sexual-assault exams at the time of the exam in question. *Id.* at ¶ 5. It also found that the defendant had the opportunity to cross-examine the nurse on the basis of her knowledge and question her conclusions. Based on all the foregoing, it overruled the defendant's assignment of error.

{¶ 44} Here, Ressler is employed at Riverside Methodist Hospital in the emergency department. She has worked there for 9 years and has been with Ohio Health for 29 years. Prior to Riverside Methodist Hospital, she worked at Grant Medical Center in the trauma critical care unit. She has been a SANE certified nurse since 2009 and a regular nurse for 29 years. She took a class to become a SANE nurse, which consisted of 40 hours of classroom education and completing approximately 20 physician-supervised pelvic exams. She has performed 40 to 50 SANE examinations. Ressler testified that a SANE nurse trains in the collection of forensic evidence for a sexual-assault victim. A SANE nurse can do a pelvic exam, which is not something a regular registered nurse would do normally.  Her testimony was based on her experience and training, and appellant had an opportunity to cross-examine her.

{¶ 45} The trial court was satisfied pursuant to Evid.R. 702.  Appellant cited no case law in support of his arguments.  Based on our review, the trial court did not abuse its discretion by qualifying Ressler as an expert.  Appellant's fourth assignment of error is overruled.

## VI. ASSIGNMENT OF ERROR FIVE–GUN EVIDENCE–HARMLESS ERROR

{¶ 46} Appellant claims the trial court erred and abused its discretion when it allowed the state to call Detective Gauthney as a witness, and when it admitted the firearm into evidence over appellant's counsel's objection.  Appellant argues that the testimony about the recovered firearm, and its admission, was irrelevant and prejudicial.

{¶ 47} At the start of trial, the prosecutor informed the court that it wanted to introduce testimony about a firearm that was discovered about a month after this sexual assault. The prosecutor told the court that:

> A detective with the Columbus Police encountered the defendant at North Meadows * * *. *Mr. Winston fled and discarded a firearm.* There were no charges filed from that, but having known about the sexual assault that occurred in the area, the detective then submitted that for test - - the gun for testing and that gun is substantially similar to the firearm that was described in the sexual assault, and so the State would be asking for us to be able to use it with the detective.

(Emphasis added.) (Tr. at 43-44.)

{¶ 48} Later, during the trial, the parties again discussed the admission of this evidence. Appellant objected based on Evid.R. 404(B) grounds at this time. The prosecutor responded:

> [W]e have an eyewitness account of a detective *who saw the Defendant with a gun* that is similarly - - the victim similar - - gave a similar description as to this gun, and the State is solely bringing it in - - bringing it in for the purposes of saying that the Defendant had a gun that was similar to the one that was described by the victim.

(Emphasis added.) (Tr. at 304-05.)

{¶ 49} The trial court overruled the objection and said it would allow the detective to testify to his eyewitness account of what occurred. Detective Gauthney testified that about one month after the incident in this case, he was working in the "North Meadows/161 area" when he saw appellant, who he knew from having encounters with the community in that area. (Tr. at 646.) The detective "retrieved [a firearm] *from the area where Mr. Winston was*" and sent it to the lab for DNA analysis, which revealed inconclusive results. (Emphasis added.) (Tr. at 646-48.) He did not actually see appellant with the gun or take it off his person. (Tr. at 649.)

{¶ 50} As such, the detective did not testify that he saw the defendant with a gun or that he saw him discard the same. He testified that he saw the defendant in "the area where" a firearm was found. As such, the detective's testimony was not consistent with what had been represented to the court. However, appellant never objected after the admission of this evidence, nor moved to strike, on the basis that the prosecutor misrepresented the

evidence to the court. Appellant's counsel did object to the admission of the gun as evidence, but only based on his previous arguments, i.e., other acts evidence and that the prejudicial value of this evidence outweighed its probative value. The trial court allowed the firearm to be admitted into evidence.

{¶ 51} The Ohio Rules of Evidence mandate exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A). A trial court "has broad discretion in the admission and exclusion of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby," an appellate court should be slow to interfere. *State v. Hymore,* 9 Ohio St.2d 122, 128 (1967).

{¶ 52} Based on our review, we find that even if the trial court did not abuse its discretion by relying on the representations of the state in its initial evidentiary ruling, once the detective provided no evidence that he saw appellant possess or discard the gun, and there was no DNA evidence linking him to the gun, the prejudicial value of this evidence substantially outweighed its probative value. There was nothing to link this firearm to appellant. The detective admitted that he did not know if the gun had "something to do with the case or not." (Tr. at 650.)  As such, the evidence should have been excluded.

{¶ 53} However, even if this evidence should have been excluded, its admission was harmless. Appellant fails to demonstrate any prejudice that resulted from the admission of this testimony. The jury also heard that DNA evidence did not link appellant to that firearm and that DNA evidence did not link that firearm to this case. Furthermore, appellant's counsel elicited testimony that the detective did not remove this firearm from appellant's person or actually see him with this firearm. In light of the DNA evidence and A.B.'s testimony regarding the incident, the gun testimony and admittance did not contribute to appellant's conviction and was harmless beyond a reasonable doubt. Appellant's fifth assignment of error is overruled.

## VII. DISPOSITION

{¶ 54} Having overruled appellant's five assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and KLATT, JJ., concur.

_____